Glendora DIXON, Plaintiff–Appellant,

v.

Laverne BRADSHER and William Clayton Rowe, Defendants–Respondents.

No. 16077.

Missouri Court of Appeals,
Southern District,
Division Two.

Oct. 30, 1989.

Siegrid Smith Maness, Maness & Miller, Doniphan, for plaintiff-appellant.

James E. Spain, Hyde, Purcell, Wilhoit, Spain, Edmundson & Merrell, Poplar Bluff, for defendants-respondents.

HOGAN, Judge.

In this action for a declaratory judgment, plaintiff Glendora Dixon sought a declaration that a gift of $28,753.30 made by her deceased husband to defendant Laverne Bradsher was invalid. Plaintiff further sought an order requiring the defendants to return the gift, or at least the sum of $28,753.30 to her as joint owner of the bank account from which that sum was taken. The defendants have had judgment and the plaintiff appeals. We affirm.

In response to a general request by the plaintiff, the trial court made findings of fact and conclusions of law. The findings of fact may, in part, be a matter of inference, but our review of the transcript and the exhibits filed convinces us they are essentially correct. They are as follows:

"1. John M. Dixon and Glendora Dixon were lawfully married in June of 1974 and resided in Ripley County, Missouri until Mr. Dixon's death on February 1, 1987.

2. At the time of [their] marriage Mr. Dixon was 67 years old and Mrs. Dixon was 57 years old.

3. This was the second marriage for both Mr. Dixon and Mrs. Dixon as each had been previously married and each had issue from the previous marriage.

4. Laverne Bradsher is the only child of John Dixon. She currently lives in Pampa, Texas but has visited her father regularly over the years.

5. In June of 1974 Mr. Dixon deeded approximately 59 acres in Ripley County, Missouri to his daughter, Laverne Bradsher.

6. In June of 1974 Mr. Dixon also deeded 80 acres of land in Ripley County, Missouri, including the family home, to himself and Glendora Dixon.

7. Subsequent to the marriage Mr. Dixon converted all of his holdings to the joint names of himself and Glendora Dixon.

8. Mrs. Dixon came into the marriage with approximately $17,000.00, none of which was converted to the joint names of herself and her husband. None of Mrs. Dixon's income during the marriage was put into joint names but rather went into her separate bank account.

9. All income received by Mr. Dixon during the marriage was placed in the joint names of himself and Glendora Dixon.

10. Clayton Rowe, Carl Smith, Frankie Glisson and Andrew Colburn were all long-time friends of John M. Dixon during his life. During the last several years of his life all of these people visited with Mr. Dixon on a regular basis. Clayton Rowe was particularly close to Mr. Dixon and Mr. Dixon often commented on how fond he was of Clayton Rowe.

11. In August of 1986 Mr. Dixon was seventy-nine (79) years old and suffered from pancreatic cancer.

12. On August 13, 1986 Mr. Dixon executed a Will which left all of his property to his wife, Glendora Dixon.

13. At or about the time of the execution of the 1986 Will John M. Dixon came by the office of Mike Johnson in Doniphan, Missouri and expressed concern over the 1986 Will. Mr. Dixon told Mr. Johnson that the Will did not do what he wanted it to do.

Mr. Dixon was alone when he came by Mr. Johnson's office and in fact drove there. Mr. Johnson testified that Mr. Dixon seemed to know what he wanted to do and it was his opinion that Mr. Dixon was of sound mind on that day.

14. In early November of 1986, approximately one (1) week before Laverne Bradsher's return to Naylor, Carl Smith went to visit John Dixon at Mr. Dixon's house in Naylor, Missouri. At this time Mr. Dixon asked Mr. Smith to call Clayton Rowe and ask him to come by. Shortly thereafter Clayton Rowe came by Mr. Dixon's house and Mr. Dixon indicated to him, in Mr. Smith's presence, that he was not happy with his will and asked for his help in providing for his daughter, Laverne Bradsher, to receive ½ of his money.

15. Shortly thereafter, in early November of 1986, Laverne Bradsher returned to Naylor, Missouri to visit her father.

16. On or about November 9, 1986 Carl Smith and Clayton Rowe came to visit Mr.

Dixon at his home in Naylor, Missouri. Present were John Dixon, Glendora Dixon, Laverne Bradsher, Clayton Rowe and Carl Smith. Sometime in the afternoon, at Mr. Dixon's request, Clayton Rowe and Laverne Bradsher went to Mr. Dixon's safe deposit box and brought the contents home for Mr. Dixon to look through. The safe deposit box contained the 1986 Will, 3 Certificates of Deposit, and several miscellaneous items. The Certificates of Deposit were in the amount of $10,000.00, $10,000.00 and $15,000.00 and were made out in the names of John Dixon, Glendora Dixon or Laverne Bradsher.

Laverne Bradsher read the Will to her father and asked him if it did what he wanted it to do. Mr. Dixon stated that it did not and tore it in two. He then asked Clayton Rowe and Carl Smith to burn the document. Mr. Rowe and Mr. Smith proceeded outside and burned the 1986 Will in front of the window so Mr. Dixon could watch.

Mr. Dixon then expressed a desire to split the Certificates of Deposit between Laverne Bradsher and Glendora Dixon equally that day. It was too late to cash the Certificates of Deposit so Laverne Bradsher suggested that Glendora Dixon take the two (2) $10,000.00 Certificates of Deposit and that she take the $15,000.00 Certificate of Deposit. Glendora Dixon protested mildly but agreed to this division.

Clayton Rowe, Carl Smith and Laverne Bradsher all testified that Mr. Dixon knew what he was doing on this day and that he made his intention known. It was the opinion of each of these witnesses that Mr. Dixon was of sound mind when he expressed his desire that his wife and daughter share his money equally on this day.

17. John Dixon was admitted to Doctors Regional Medical Center on November 29, 1986 and was released on December 5, 1986. Mr. Dixon was admitted to the hospital because he had developed pneumonia in his left lung.

18. During this stay in the hospital Mr. Dixon was often visited by Glendora Dixon, Laverne Bradsher, Clayton Rowe and Carl Smith. There were occasions when Clayton Rowe and Carl Smith would spend the night in the hospital with Mr. Dixon.

19. Mr. Dixon's treating physician during this hospitalization was Dr. Mark Bauman. Dr. Bauman's first contact with Mr. Dixon was during his previous hospitalization from October 15, 1986 until November 1, 1986.

On direct examination Dr. Bauman testified that he did not have any independent recollection of Mr. Dixon's mental status.[1] When asked his opinion as to whether Mr. Dixon was capable of making decisions about probate estate or financial decisions Dr. Bauman testified, 'all I have to go on here is the record and I don't know that I can really say.' When pressed further he testified that it was his opinion that Mr. Dixon was not capable of making any valid decisions on December 1, 1986. This opinion was based exclusively on Dr. Bauman's office notes. The only note made by Dr. Bauman regarding Mr. Dixon's mental state was a note dated December 1, 1986 which stated, 'Mr. Dixon is confused this morning after getting a sleeping pill last evening'. There were no other notes made by Dr. Bauman regarding Mr. Dixon's mental status.

On cross-examination Dr. Bauman then admitted that his testimony was based on the records and that he could not personally state the specifics concerning Mr. Dixon's condition on December 2, 1986. On redirect-examination Dr. Bauman testified that he was of the opinion that Mr. Dixon did not have the competence to execute a legal document during his stay in the hospital. On recross examination Dr. Bauman admitted that he did not know what time of the day the power of attorney was signed and did not know his condition at that time.

20. The nursing notes indicate that Mr. Dixon was confused on December 1, 1986 after taking sleep medication. There are

**1.** By agreement, Dr. Bauman's deposition was received in evidence even though the record indicates his presence might have been obtained by subpoena. We have omitted the page references to the Bauman deposition which are part of the trial court's findings.

no other indications of confusion in the nursing notes throughout Mr. Dixon's stay in the hospital from November 29, 1986 until December 5, 1986. In fact, the nursing notes indicate that Mr. Dixon was alert as to person, place and time.

21. On December 2, 1986 Mr. Dixon was visited in Doctors Regional Medical Center by Glendora Dixon, Laverne Bradsher, Clayton Rowe and Carl Smith. Sometime during the day Laverne Bradsher and Clayton Rowe went to the offices of Mr. James E. Spain and had a Power of Attorney drafted giving Clayton Rowe the authority to withdraw ½ of all accounts in his name on deposit with the Mercantile First National Bank of Doniphan, Missouri and to redeposit said accounts in the name of Laverne Bradsher. After talking to Mr. Spain, Mr. Rowe and Ms. Bradsher returned to the hospital.

Shortly thereafter an attorney from Mr. Spain's office and a notary public came to Mr. Dixon's hospital room at Doctors Regional Medical Center to deliver the Power of Attorney. Present in the room were Glendora Dixon, Laverne Bradsher, Clayton Rowe and Carl Smith. The Power of Attorney was explained to Mr. Dixon and he signed it. Clayton Rowe and Carl Smith then left the hospital and drove to Doniphan where $27,987.26 was withdrawn from one account and $766.04 was withdrawn from another account and deposited in the name of Laverne Bradsher. These figures represented ½ of the balance of the 2 accounts on deposit with the Mercantile First National Bank of Doniphan.

Sometime later that day Mr. Dixon was visited by Andrew Colburn in the hospital. Andrew Colburn, Clayton Rowe, Carl Smith and Laverne Bradsher all testified that Mr. Dixon recognized them on December 2, 1986, knew where he was, and appeared to know what he wanted to do. It was the opinion of each of these people that Mr. Dixon was mentally competent on this day.

22. Mr. Dixon was discharged from the hospital on December 5, 1986. Shortly thereafter Clayton Rowe and Carl Smith visited him and told him what they had done pursuant to the Power of Attorney he had signed. Mr. Dixon confirmed that that was what he wanted done and did not mention it again.

23. Mr. Dixon died on February 1, 1987. Between the time when he was released from the hospital on December 5, 1986 and his death he was visited often by Clayton Rowe, Carl Smith, Andrew Colburn and Frankie Glisson. These people testified that Mr. Dixon did not lose his mental faculties before his death."

Another preliminary matter of fact which must be noted is that the ownership of the bank accounts from which withdrawals were made on December 2, 1986, is not in issue here. Counsel stipulated that the two accounts from which money was withdrawn *"were joint accounts between John M. Dixon and Glendora Dixon* [and] *... either one of them could have at any time withdrawn all the money from either one of those accounts."* (Emphasis added.)

■ In this court, the plaintiff has briefed three overlapping assignments of error. Her first point, as stated, is that "The Court's finding that the signing of the Power of Attorney on December 2, 1986 by John M. Dixon and the subsequent transfer of funds by William Clayton Rowe was an inter vivos gift in the amount of $28,753.30 from John M. Dixon to Laverne Bradsher was contrary to the evidence and the law in that the evidence showed that the requisite elements for an inter vivos gift were missing." We are cited to *In re Estate of Evans*, 614 S.W.2d 315 (Mo.App. 1981), which states the essentials of a valid inter vivos gift. We do not disagree with the ruling in *Evans*, but the questions raised on this appeal need not be approached as if we were considering a gift of tangible personalty, or the symbolic transfer of an interest in a savings account by delivery of a passbook, or some other indirectly executed gift. As a general principle, a gift of money on deposit in a bank may be effected by an act sufficient to place the fund under the donee's control, so that nothing further is necessary on the part of the donor in order to give possession. 38 Am.Jur.2d Gifts § 70, p. 874 (1968). With that basic principle in mind,

we consider the plaintiff's various assignments of error.

■ Plaintiff asserts that the donor lacked the requisite intent to make an inter vivos gift because he lacked the mental capacity necessary to form the requisite intent.

Both parties rely on *Flynn v. Union National Bank of Springfield*, 378 S.W.2d 1 (Mo.App.1964), in which this court held that the order of mental capacity required to make an inter vivos gift is the same as that required to make a will. In *Flynn*, this court stated that "[m]erely to show that one suffers from senility, confusion, or forgetfulness, or is possessed of a mental weakness, is not enough to avoid a gift, although these are factors to be considered. One must go further and show that *the donor did not possess sufficient mind to understand, in a reasonable manner, the nature and effect of the act in which [he] was engaged." Flynn v. Union National Bank of Springfield*, 378 S.W.2d at 9. (Emphasis in original.)

It was clearly established that Mr. Dixon was ill when he executed the Power of Attorney, but physical ills are not necessarily mental ills which will invalidate a gift. Cf. *Gardine v. Cottey*, 360 Mo. 681, 704, 230 S.W.2d 731, 746, 18 A.L.R.2d 1100, 1119 (banc 1950). The fact that Mr. Dixon was gravely ill when he executed the Power of Attorney is not a circumstance which, of itself, required the trial court to find that he lacked the capacity to make a gift.

The plaintiff also stresses testimony and written evidence indicating that on occasion Mr. Dixon was irrational while he was hospitalized from November 30 until December 5, 1986. The trial court took note of this testimony in its findings numbered 19 and 20. It also took note of the fact that lay witnesses Colburn, Rowe, Smith and Bradsher all testified that Dixon was rational and well oriented when he executed the Power of Attorney. Certainly Dr. Bauman's testimony was entitled to be weighed as the testimony of an expert, but the lay witnesses, who had had an opportunity to observe and talk with Dixon at or near the time he executed the Power of Attorney

were competent to testify that he was of sound mind when he did so, *Vineyard v. Vineyard*, 409 S.W.2d 712, 716–717[1] (Mo. 1966); *Kaechelen v. Barringer*, 19 S.W.2d 1033, 1037[8][9] (Mo.1929), and the fact that Dr. Bauman's testimony was that of an expert did not make it conclusive. *Clark v. Leonard*, 232 S.W.2d 474, 481[5] (Mo.1950); 31A Am.Jur.2d Expert and Opinion Evidence § 188, p. 193 (1989). Plaintiff's suggestion that the transfer of funds might have been accomplished more directly does not militate against the validity of the gift and her suggestion that the gift was not complete distorts the record. Mr. Rowe testified that after the Power of Attorney was executed he went to the bank, drew money from Dixon's account or accounts and put it in Laverne Bradsher's name. We find the plaintiff's first point to be without merit.

The plaintiff's second point is that the evidence requires a finding that the gift was procured by the exercise of undue influence. The trial court concluded as a matter of law that:

"14. Laverne Bradsher proved by clear, cogent, and convincing evidence that no undue influence was used to obtain the gift from her father. The Court finds persuasive that Glendora Dixon lived with the decedent until his death and was present when the decedent signed the Power of Attorney, that the decedent had apparently made up his mind to give his daughter ½ of his money before she came home to visit, and that this was a natural disposition of the decedent's money."

Our courts have held that a presumption of the exercise of undue influence arises when there is evidence that the donor and donee, or "benefactor and beneficiary" stood in a relationship of confidence and trust and there is evidence, other than the existence of a confidential relationship from which the exercise of undue influence may be inferred. *Davis v. Pitti*, 472 S.W.2d 382, 388[7][8] (Mo.1971); *Estate of Brown v. Fulp*, 718 S.W.2d 588, 595 (Mo. App.1986); *In re Estate of Hayes*, 658 S.W.2d 956, 958[4,5] (Mo.App.1983). A con-

fidential relationship is said to exist when one person relies upon and trusts the other with the management of his property and attendance to his business, thereby creating some degree of fiduciary obligation. *Davis v. Pitti,* 472 S.W.2d at 387; *Estate of Ferling,* 670 S.W.2d 109, 112[6] (Mo.App. 1984); *Flynn v. Union National Bank of Springfield,* 378 S.W.2d at 10–11[14]. Once the proponent has raised a presumption of the exercise of undue influence, he has made a prima facie case which does not disappear even when countervailing evidence is introduced. *Simmons v. Inman,* 471 S.W.2d 203, 206[2] (Mo.1971); *Estate of Brown v. Fulp,* 718 S.W.2d at 596; *Carroll v. Knott,* 637 S.W.2d 368, 370 (Mo.App. 1982). Nevertheless once the presumption of undue influence is raised, the exercise thereof continues to be an issue for resolution by the trier of fact. *Loehr v. Starke,* 332 Mo. 131, 142, 56 S.W.2d 772, 776[3] (banc 1932); *Simmons v. Inman,* 471 S.W.2d 203, 206[2] (Mo.1971); *Estate of Brown v. Fulp,* 718 S.W.2d at 596.

This case, however, involves a gift from a father to his daughter and a deed or gift from a parent to a child does not require the absence of fraud and undue influence to sustain it. The relationship of parent and child is not, of itself, a fiduciary relationship within the meaning of the rule applying to gifts or other transactions with a fiduciary. *Lee v. Lee,* 258 Mo. 599, 613, 167 S.W. 1030, 1035[12] (1914); *Amado v. Aguirre,* 63 Ariz. 213, 161 P.2d 117, 120, 160 A.L.R. 1126, 1131 (1945); 59 Am.Jur.2d Parent and Child § 131, p. 267 (1987). There is, indeed, a considerable body of precedent which holds that an unexplained transfer of property from a parent to a child raises a rebuttable presumption, or inference, that a gift was intended. Annot., 94 A.L.R.3d 608, 612 (1979). This is not to say that a fiduciary or confidential relation may not exist between a parent and his child, but to establish the existence of such a relation, there must be proof of circumstances indicating actual dominance of the donee over the donor. *Amado v. Aguirre,* 63 Ariz. 213, 161 P.2d at 120[11], 160 A.L.R. at 1131. As our older precedents put the matter, it must be shown that

the "natural sentiments [between parent and child] have been prostrated to unnatural and selfish ends." *Cook v. Higgins,* 290 Mo. 402, 426, 235 S.W. 807, 814 (banc 1921); *Sinnett v. Sinnett,* 201 S.W. 887, 889[2] (Mo.1918).

In this case there is evidence that Laverne Bradsher participated in the transfer of funds from her father's account (or accounts) to hers. When a confidential relation exists between the donor and donee, the donee's activity in procuring the gift or benefaction is considered proof of the exercise of undue influence. *Simmons v. Inman,* 471 S.W.2d at 206; *Estate of Brown v. Fulp,* 718 S.W.2d at 596. There is, however, no indication of a fiduciary or confidential relationship between the donor and donee in this case other than that which one might expect between an aged male and his only daughter. This is not a case like *Bohnsack v. Hanebrink,* 240 S.W.2d 903 (Mo.1951), where an 86–year–old mother who was irrational at times because of senility, executed a general Power of Attorney to her son, giving him full power to deal with all her realty and personalty, and the son took charge of his mother's business affairs, collected her rent, banked her money and paid her bills. There, a confidential relation was found to exist.

Here, it is a fair inference that the division of assets was originally Mr. Dixon's idea. If Laverne participated in procuring the transfer of funds from her father's accounts to hers, there was no showing, as we have just said, of a confidential relationship between the donee and the donor, and no evidence which would require the trial court to find that the donee actually dominated the donor. The point is without merit.

The final point briefed is that even if Mr. Dixon "had the capacity to have intent to give William Clayton Rowe power and authority by means of the alleged power of attorney, William Clayton Rowe exceeded the power conferred by said document." The substance of this point is that the accounts from which money was to be withdrawn were insufficiently described

in the Power of Attorney. We have examined the record and find ourselves in doubt that this point is before us for review. We cannot find that the alleged infirmity of the Power of Attorney was ever submitted to the trial court. We find no mention of the point in plaintiff's closing argument or in the brief which she submitted with her proposed findings of fact. An appellate court will not, on review, convict a lower court of error on an issue which was not put before it to decide. *Lincoln Credit Co. v. Peach,* 636 S.W.2d 31, 36[12] (Mo. banc 1982), appeal dismissed, 459 U.S. 1094, 103 S.Ct. 711, 74 L.Ed.2d 942 (1983); *ASARCO, Inc. v. McNeill,* 750 S.W.2d 122, 129 (Mo.App.1988).

Assuming arguendo that this assignment of error was in some manner raised in the trial court, we find it to be without merit. The Power of Attorney granted Mr. Rowe authority to:

"Withdraw one-half (½) of all accounts in my name presently on deposit with the Mercantile First National Bank of Doniphan, Missouri, and to redeposit said accounts in the name of my daughter, Laverne Bradsher."

The record indicates that plaintiff and her husband had a joint checking account and a joint savings account. Mr. Rowe withdrew $27,987.26 from the savings account and he withdrew $766.04 from the checking account. There is no question that Mr. Dixon had the right to withdraw funds from both accounts; it was so stipulated and in addition, since he furnished all the funds which went into the joint accounts, he could terminate the interest of the non-contributing owner without responsibility. *Home Savings Ass'n of Kansas City v. Bratton,* 721 S.W.2d 40, 45 (Mo. App.1986). If the Power of Attorney did not precisely describe the accounts from which the money was to be taken, the rule of interpretation to be applied is that where the meaning of the instrument or the operative language therein is uncertain, obscure or ambiguous, the intention of the parties as it existed at the time the power was granted is to be given effect. *Prior v. Hager,* 440 S.W.2d 167, 173 (Mo.App.1969). The only bank accounts Mr. Dixon had

when he executed the Power of Attorney were the two joint accounts in the Mercantile First National Bank of Doniphan. The Power of Attorney was obviously intended to be exercised as to those accounts. Further, Mr. Dixon ratified the act of his agent when he was told what had been done. We find no merit in the argument that the gift should be set aside because the language of the Power of Attorney was ambiguous.

We find no error in any respect presented to this court. Accordingly, the judgment is affirmed.

PREWITT, Acting P.J., and MAUS, J., concur.