Kenneth M. OSTERKAMP,
Appellant/Cross–
Appellee,

v.

Kattaryna STILES, Appellee/Cross–
Appellant.

Nos. S–13297, S–13317.

Supreme Court of Alaska.

June 25, 2010.

Mary A. Gilson and Allison E. Mendel, Mendel & Associates, Anchorage, for Appellant/Cross–Appellee.

Robert C. Erwin and Roberta C. Erwin, Robert C. Erwin, LLC, Anchorage, for Appellee/Cross–Appellant.

Before: CARPENETI, Chief Justice, FABE, WINFREE, and CHRISTEN, Justices.

*OPINION*

CHRISTEN, Justice.

## I. INTRODUCTION

Kenneth Osterkamp appeals the award of sole physical and legal custody of Simon Stiles[1] to his adoptive mother, Kattaryna Stiles. Ken and Kattaryna were Simon's

---

1. This opinion uses a pseudonym to protect the minor's privacy.

foster parents from one week after Simon was born until Kattaryna adopted Simon when he was sixteen months old. Ken and Kattaryna continued to raise Simon together as domestic partners until Simon was twenty months old, at which point Kattaryna separated from Ken. After Kattaryna began limiting Ken's visitation, he filed a complaint for custody and visitation. The superior court denied Ken custody, concluding that he did not meet the substantive requirements for a third party seeking custody over the objection of the legal parent. It concluded that between the time Kattaryna adopted Simon and the time Ken filed suit, Ken had not established psychological parent status. The superior court did not reach the question of whether Ken met the substantive requirements for a third party seeking visitation. We affirm the superior court's award of legal and physical custody to Kattaryna because we agree that Ken did not establish by clear and convincing evidence that awarding sole custody to Kattaryna would be clearly detrimental to Simon; it was not clearly erroneous for the superior court to conclude that at the time Ken filed his complaint he was not Simon's psychological parent. Given the already protracted length of these proceedings, we reach the merits of the visitation issue and conclude that Ken did not prove by clear and convincing evidence that it would be in Simon's best interests for the court to order visitation over Kattaryna's objection.

Ken also appeals the superior court's credit of loan payments to Kattaryna, the award of attorney's fees to Kattaryna, and the issuance of a writ of assistance without proper notice. Kattaryna cross-appeals the superior court's order requiring her to repay money she received from Ken's parents. We affirm the superior court's rulings on property issues and attorney's fees, but conclude that it was error to issue a writ of assistance without providing both parties with proper notice and an opportunity to be heard.

## II. FACTS AND PROCEEDINGS

### A. Custody And Visitation

Kenneth Osterkamp and Kattaryna Stiles met in the spring of 2002 and became romantically involved shortly thereafter. They began living together, first in Kattaryna's apartment and then in a condominium they purchased together in 2003. They bought a home together in late 2004 where they lived until separating in March 2007. Ken and Kattaryna never married, but they considered themselves to be domestic partners.

In 2004 Ken and Kattaryna became foster parents together, successively serving as foster parents to several infants. On September 1, 2005, the Office of Children's Services (OCS) placed Simon with Kattaryna and Ken. Simon was born on August 25, 2005 and is an Indian child under the Indian Child Welfare Act (ICWA).[2]

Ken and Kattaryna began taking steps to adopt Simon in early 2006, even as they began to experience difficulties in their relationship. They dispute whether they decided to adopt Simon as a couple, although a home study for joint adoption was conducted in spring 2006. Kattaryna claims she always planned to adopt Simon on her own but a social worker advised putting Ken's name on the home study in case they later decided to adopt together. Ken claims that the plan was always for joint adoption and he only agreed to remove his name from the adoption petition after Kattaryna insisted that they wait and see if their relationship improved before including his name. Ken and Kattaryna agreed that if Ken ultimately did not adopt Simon, he would be like a "beloved uncle" and continue to have a role in Simon's life. Once it was decided that, at least initially, Kattaryna would adopt Simon by herself, a second adoption study was completed taking these changed circumstances into account. Both adoption studies recommended that the adoption proceed.

On December 28, 2006, the court held an adoption hearing and issued an adoption decree.[3] Simon was sixteen months old and

---

**2.** 25 U.S.C. § 1903(4) (2006).

**3.** Simon's biological mother's parental rights were terminated and his biological father voluntarily relinquished his parental rights. The tribes

with which Simon is affiliated received notice of the adoption hearing and filed no objection; the court found good cause to deviate from ICWA's placement preferences.

had spent all but one week of his life living with Ken and Kattaryna. Ken attended the hearing and did not raise any objections or concerns over his name not appearing on the adoption decree. Nor did he request to reserve any post-adoption rights. After the adoption, Ken, Kattaryna, and Simon continued to live together as a family unit for three months.

Kattaryna separated from Ken in March 2007 after a heated argument, but she testified that she had been planning to leave for many months. The parties initially agreed Ken would have visitation with Simon but Kattaryna began limiting visitation to once every two or three weeks, with no overnights. Kattaryna also forbade Simon's social worker and daycare providers from referring to Ken as "dad" or "father," and forbade Ken from doing the same.

In April 2007, Ken filed a complaint for joint legal and physical custody. He claimed that as Simon's "psychological father" and as someone who had acted *in loco parentis* for Simon, he had a right to joint custody. Ken also sought an order compelling Kattaryna to consent to his joint adoption of Simon. The superior court ordered interim visitation while the complaint for custody was pending, but Kattaryna retained sole legal and primary physical custody. In response to a motion filed by Ken, the court appointed a custody investigator in June 2007.

In March 2008, eleven months after filing his initial complaint, Ken filed a motion in limine to determine his standing to seek custody or visitation. He asked the court to determine before trial whether he was a psychological parent to Simon. The court partially granted the motion in April 2008, allowing Ken to proceed to trial but deferring until trial the question of whether Ken was Simon's psychological parent.

The custody investigator filed a report in June 2008 explaining that "it is guesswork" to determine whether a person is a psychological parent to a toddler. But because Ken and Kattaryna were Simon's only caregivers during the first nineteen months of his life, the investigator concluded "one can be fairly

certain" that Simon had "more or less" equal emotional attachments to each of them. Similarly, a psychological evaluation completed at the request of the custody investigator observed that Simon had positive interactions with both Ken and Kattaryna and that both Ken and Kattaryna demonstrated parental love and affection towards Simon.

Ken and Kattaryna experienced great difficulty cooperating with each other to implement the court's visitation schedule. Kattaryna repeatedly expressed to both the custody investigator and psychological evaluator that she no longer wanted Ken in Simon's life. This led to conflict, sometimes in front of Simon.

A bench trial was held in early July 2008. The court entered an oral ruling on August 22, 2008 awarding Kattaryna sole legal and physical custody of Simon. Although the superior court found Ken had established psychological parent status by the time of trial, the court ruled that the period from the adoption in December 2006 until the custody suit in April 2007 was the dispositive time period for purposes of assessing Simon's bond with Ken. The court concluded that Ken was not Simon's psychological parent as of the time the parties separated and Ken filed his complaint. The court also concluded that Ken had not shown by clear and convincing evidence that it would be clearly detrimental to Simon to remain in Kattaryna's custody. The court was silent on Ken's claim for visitation rights.

After the court read its oral ruling into the record, the court, at the suggestion of Kattaryna's attorney, discussed and issued a writ of assistance to Kattaryna to obtain physical custody of Simon. Because the court had failed to send notice to the parties informing them when the ruling would be read, Ken and his attorney were not present during the discussion or issuance of the writ of assistance; Kattaryna's attorney was present because she noticed the proceeding scheduled on CourtView.[4]

In October 2008 Ken unsuccessfully requested visitation pending appeal. He has

---

4. CourtView is the trial court's electronic, online docketing and calendaring system.

had no contact with Simon since August 2008.

Ken appeals the superior court's denial of custody as well as its failure to determine if he met the substantive requirements for visitation. He also appeals its issuance of a writ of assistance without proper notice.

### B. Property Issues

In 2004 Ken's parents gave Kattaryna and Ken $44,000 to finance the purchase of their home.[5] Ken's parents issued "gift letters" of $22,000 each to Kattaryna and Ken. These letters purported to require no repayment. Nonetheless, Kattaryna made monthly payments to Ken's parents from October 2005 until February 2007, writing "home loan" on each check. Ken and his mother testified that the expectation was for both $22,000 payments to be paid back, but with no interest and without a deadline for repayment. Kattaryna argued the $22,000 payment was a gift and that her monthly payments were made out of moral obligation only.

In its August 2008 oral ruling, the court found that Ken's parents loaned $44,000 to the parties. The court credited Kattaryna $4,200 for payments she had made on her loan and ordered her to repay the remaining $17,800. After accounting for Kattaryna's loan payments, Ken's home improvements, and the amount owing on the mortgage, the court found Kattaryna's share of the home equity to be $50,132, and Ken's share to be $78,883.75. The court ordered that the parties refinance the home to remove Kattaryna from the mortgage obligation, and that they equally share the cost of refinancing.

Ken appeals the superior court order crediting only Kattaryna for payments she made to Ken's parents. Kattaryna cross-appeals the superior court's order requiring that she repay a loan she received from Ken's parents.

### C. Attorney's Fees

In October 2006 Kattaryna successfully moved for interim attorney's fees under AS 25.24.140(a)(1), which permits interim fee awards in divorce or dissolution actions. At trial, the court found the interim fee award continued to be justified because Ken was living in the parties' home and had a greater income. Ken appeals the superior court's award of attorney's fees to Kattaryna.

## III. STANDARD OF REVIEW

■ The superior court has "broad discretion in custody awards."[6] We will reverse a superior court's custody and visitation determination "only if the superior court has abused its discretion or if its controlling findings of fact are clearly erroneous."[7] The superior court abuses its discretion when it "consider[s] improper factors in making its custody determination, fail[s] to consider statutorily mandated factors, or assign[s] disproportionate weight to particular factors while ignoring others."[8] We review factual findings, including determinations of psychological parent status, for clear error.[9] A factual finding is clearly erroneous when a review of the record leaves us with the definite impression that a mistake has been made.[10]

■■ "Whether factual findings are sufficient to support an award of custody to a third party is a legal issue to which we apply

5. The superior court observed that the total loan amount was actually $48,000, but found that only $44,000 was related to the home. Because it did not find that the remaining $4,000 was related to the home, it did not include this amount in its calculations. Neither party appeals this decision.

6. *In re Adoption of Missy M.*, 133 P.3d 645, 648 (Alaska 2006) (quoting *Elton H. v. Naomi R.*, 119 P.3d 969, 973 (Alaska 2005)) (internal quotation marks omitted).

7. *R.I. v. C.C.*, 9 P.3d 274, 277 (Alaska 2000) (internal citations omitted); *see also Skinner v.*

*Hagberg*, 183 P.3d 486, 489 (Alaska 2008) (reviewing visitation orders for abuse of discretion) (citing *Lone Wolf v. Lone Wolf*, 741 P.2d 1187, 1190 (Alaska 1987)).

8. *In re Missy M.*, 133 P.3d at 648 (quoting *Fardig v. Fardig*, 56 P.3d 9, 11 (Alaska 2002)).

9. *Kinnard v. Kinnard*, 43 P.3d 150, 153 (Alaska 2002).

10. *In re Missy M.*, 133 P.3d at 648.

our independent judgment."[11]  Likewise, "[w]hether the court applied the correct standard in a custody determination is a question of law we review de novo."[12]

■ Interim attorney's fee awards in divorce-like proceedings are reviewed for abuse of discretion.[13]  We will not reverse such an award "unless it is arbitrary, capricious, manifestly unreasonable, or stems from an improper motive."[14]

## IV.  DISCUSSION

### A.  The Standing Issue

■ Prior to trial, Ken filed a "Motion in Limine to Determine Plaintiff's Standing." He asked the court to determine, before trial, whether he was "the psychological parent of [Simon]."  The superior court did not decide prior to trial whether Ken was Simon's psychological parent; the court ordered that Ken would have to prove his case at trial. Because Kattaryna did not challenge Ken's standing to bring a claim for custody or visitation in her "Partial Opposition to Motion in Limine to Determine Plaintiff's Standing"—she asked only that the court rule that former foster parents like Ken could not establish psychological parent status—the

superior court never expressly ruled on the issue of standing.  But on cross-appeal before this court, Kattaryna argues that Ken does not have standing to seek post-adoption custody or visitation because any rights he may have had based on his relationship with Simon were terminated when Kattaryna adopted Simon.

■ In *Buness v. Gillen* we considered whether a stepparent had standing to seek custody over the objection of the biological parent.[15]  We held that "a non-parent who has a significant connection with a child has standing to assert a claim for custody."[16] In *Evans v. McTaggart* we "question[ed] whether the significant connection test was intended to be merely another way of expressing psychological parent or *in loco parentis* status," but we declined to "flesh out the meaning of the significant connection test" for standing because the biological father in *Evans* had not objected to the maternal grandparents' intervention or custody motion on standing grounds.[17]  Here, because Kattaryna did not make a "specific negative averment" before the superior court that she "wishe[d] to raise an issue as to the capacity of [Ken] to sue,"[18] Kattaryna is precluded from raising an objection to stand-

---

11.  *J.W. v. R.J.*, 951 P.2d 1206, 1209 (Alaska 1998) (citing *R.R. v. State*, 919 P.2d 754, 755 n. 1 (Alaska 1996)), *overruled on other grounds by Evans v. McTaggart*, 88 P.3d 1078, 1085 n. 34 (Alaska 2004).

12.  *Elton H. v. Naomi R.*, 119 P.3d 969, 973 (Alaska 2005) (quoting *Moeller–Prokosch v. Prokosch*, 27 P.3d 314, 316 (Alaska 2001)).

13.  *See Koller v. Reft*, 71 P.3d 800, 808 (Alaska 2003).

14.  *See id.* (quoting *Zimin v. Zimin*, 837 P.2d 118, 124 (Alaska 1992)) (internal quotation marks omitted).

15.  781 P.2d 985, 986 (Alaska 1989), *overruled on other grounds by Evans*, 88 P.3d at 1085 n. 34 (Alaska 2004).

16.  *Id.* at 988.

17.  *Evans*, 88 P.3d at 1082.  We recognize that the statement in *Evans* questioning the relationship between the significant connection test and psychological parent status caused confusion.

To clarify, a third party need not prove psychological parent status in order to have standing to bring a claim for custody or visitation.  As we suggested in *Evans*, establishing psychological parent status "is more demanding than the 'significant connection' status that a third party must have in order to seek custody."  *Id.*  "Significant connection" status is a threshold question; it relates to whether a third party has standing to assert a claim for custody or visitation.  *Buness*, 781 P.2d at 988.  Psychological parent status does not *entitle* a third party to custody or visitation, but this status can help a third party prove that it would be clearly detrimental to a child to deny third party custody, or that it would be in the child's best interests to grant visitation to a third party.  *See, e.g., id.* at 989 n. 8.

18.  *Brown v. Music Inc.*, 359 P.2d 295, 300–01 (Alaska 1961).  The "failure to raise the issue of capacity to sue below results in a waiver of that defense."  *Moore v. State, Dep't of Natural Res.*, 992 P.2d 576, 577 n. 5 (Alaska 1999); *see also Jackson v. Nangle*, 677 P.2d 242, 250 n. 10 (Alaska 1984); *King v. Petroleum Servs. Corp.*, 536 P.2d 116, 118 (Alaska 1975).

ing on appeal.[19]

## B. The Superior Court Did Not Err By Concluding That Ken Failed To Establish By Clear And Convincing Evidence That Awarding Sole Custody To Kattaryna Would Be Clearly Detrimental To Simon.

Ken concedes that under AS 25.23.130(a)(2) Kattaryna's adoption of Simon resulted in the legal creation of a parent-child relationship between Simon and Kattaryna as if she were Simon's biological parent.[20] We agree; once the adoption decree was finalized on December 28, 2006, Kattaryna became Simon's sole legal parent. Ken's legal relationship to Simon has always been that of a third party, both before and after Kattaryna's adoption of Simon. The question here is whether Ken, as a third party, may obtain custody or visitation against the wishes of Kattaryna, Simon's legal parent.

We previously discussed questions of third party custody and visitation in *Evans v. McTaggart.*[21] *Evans* involved a claim by a child's maternal grandparents for custody over the objections of the child's biological parents.[22] The grandparents also sought visitation with their grandchild's half-sibling who was not biologically related. to them.[23] The *Evans* trial court did not find the grandparents to be the psychological parents of either child.[24] Addressing the custody issue in *Evans*, we stated that:

in order to overcome the parental preference [in an initial custody contest between a parent and a non-parent] a non-parent must show by clear and convincing evidence that the parent is unfit or that the welfare of the child requires the child to be in the custody of the non-parent.[25]

Ken argues that the superior court erred by concluding that he did not meet his evidentiary burden for a third party seeking shared custody. The basis of Ken's custody argument is that the "welfare of the child" requires that he continue to have contact with Simon—not that Kattaryna is an unfit parent. Our inquiry therefore focuses on whether Ken was able to meet his evidentiary burden to show "that the welfare of the child requires the child to be in the custody of the non-parent."[26] Kattaryna's fitness as a parent is not in dispute.

■ We explained the "welfare of the child" component of this analysis in *Evans*, where we decided that to be awarded custody a "non-parent must show that the child would suffer clear detriment if placed in the custody of the parent."[27] We clarify that this analysis is not limited to examining the child's relationship with the legal parent; courts may take into account the relationship between a child and a third party in determining whether awarding custody to the legal parent—and denying custody to the third party—would result in clear detriment to the child.[28]

The clear detriment Ken alleges is "the harm [Simon] will experience if his relationship with a psychological parent is ended." Ken cites to our decisions in *Buness v. Gillen*

19. Questions of standing should be raised and decided during the initial stages of litigation. Given the emotional burden custody and visitation litigation places on children and litigants, trial courts should resolve issues of standing as early as possible in the pre-trial phase of litigation.

20. In relevant part, AS 25.23.130(a)(2) provides: (a) A final decree of adoption ... has the following effect ... (2) to create the relationship of parent and child between petitioner and the adopted person, as if the adopted person were a legitimate blood descendant of the petitioner, for all purposes....

21. 88 P.3d 1078, 1079 (Alaska 2004).

22. *Id.* at 1081.

23. *Id.* at 1087.

24. *Id.* at 1082.

25. *Id.* at 1085.

26. *Evans*, 88 P.3d at 1085.

27. *Id.*

28. *See J.W. v. R.J.*, 951 P.2d 1206, 1211 (Alaska 1998) ("[T]he court may take the relationship [between a child and a third party] into account, however, in deciding whether awarding custody to the biological parent would be detrimental to the child."), *overruled on other grounds by Evans v. McTaggart*, 88 P.3d 1078, 1085 n. 34 (Alaska 2004).

and *Todd v. Todd* in support of this argument. In *Buness,* we noted that "severing the bond between the psychological parent and the child may well be clearly detrimental to the child's welfare."[29] In *Todd v. Todd,* we acknowledged that when a child's "strongest psychological bonding" is with third parties, "it would be detrimental to [the child] to destroy those bonds."[30]

To determine whether Ken met his evidentiary burden to show clear detriment, we first review the superior court's determination that Ken was not Simon's psychological parent at the time he filed suit for custody and visitation. Because Ken's clear detriment argument rests on the assertion that he has at all relevant times been Simon's psychological parent, his argument ends where it begins unless he can demonstrate he was Simon's psychological parent at the relevant time. Second, we review Ken's clear detriment argument in light of our decisions in *Buness* and *Todd.*

### 1. The superior court did not err by concluding that Ken was not Simon's psychological parent for purposes of this custody dispute.

We have explained that a psychological parent is:

> one who, on a day-to-day basis, through interaction, companionship, interplay, and mutuality, fulfills the child's psychological needs for an adult. This adult becomes an essential focus of the child's life, for he is not only the source of the fulfillment of the child's physical needs, but also the source of his emotional and psychological needs.[31]

The superior court ruled that Ken did not demonstrate he was Simon's psychological parent during the relevant time period for this custody action. And the court ruled that the relevant time period was from December 28, 2006—when Kattaryna adopted Simon—to April 12, 2007—when Ken filed suit for custody.[32]

Ken disputes the superior court's decision that these three and a half months constitute the relevant time period for assessing his status as Simon's psychological parent. He argues that the superior court should have made its determination "based on all the evidence"—from the moment Ken became Simon's foster parent in September 2005 until trial in July 2008. Ken further argues that even if the superior court was correct to consider only the interval between the entry of the adoption decree and the filing of the complaint in this action, it was still clearly erroneous to conclude that Ken had not established psychological parent status by the time he filed his complaint for custody. Kattaryna counters that Ken cannot be Simon's psychological parent because he is a former foster parent whose legal rights were extinguished by his failure to join in Kattaryna's adoption of Simon.

The issue of what time period the court should look to in determining psychological parent status is particularly significant in this case. The superior court found there was insufficient evidence that Ken had established psychological parent status as of the date Ken filed suit for custody, but the superior court's oral findings included the statement that it was "unequivocal that as of the time of trial, July 2008, [Ken] was a psychological parent to [Simon]."[33] We consider separately the time before Kattaryna adopted Simon and the time after Ken filed his complaint for custody.

---

29. 781 P.2d 985, 989 (Alaska 1989).

30. 989 P.2d 141, 143 (Alaska 1999).

31. *Evans,* 88 P.3d at 1082 (quoting *Carter v. Brodrick,* 644 P.2d 850, 853 n. 2 (Alaska 1982)).

32. The superior court made conflicting statements about whether it considered the time of suit or the time of separation to be the relevant point for determining psychological parent status. We conclude that although the superior court treated these events somewhat interchangeably, it ultimately decided that the date Ken filed his complaint for custody was the relevant date for purposes of determining his psychological parent status.

33. The superior court's written findings of fact and conclusions of law only state that (1) the court did not find Ken to be the psychological parent of Simon between the time of adoption and the date he petitioned for custody; and (2) Ken is not the psychological parent of Simon.

### a. The superior court correctly began its analysis at the moment Kattaryna became Simon's sole legal parent.

■ The superior court concluded that "no rights accrued to [Ken] during the period of his foster parenting ... such that the rights of a psychological parent would have developed," observing that Ken "voluntarily allowed [Kattaryna] to adopt [Simon] in December of 2006." Ken argues that the superior court erred as a matter of law by not considering the entire time Ken served as Simon's foster parent when it decided whether Ken met his burden of showing psychological parent status.[34] We disagree.

The purpose of an adoption decree is to vest all legal parental rights with the adoptive parent or parents, to the exclusion of all others.[35] The same policy reasons that motivate AS 25.23.130 militate against recognizing a former foster parent's claims for custody or visitation against the wishes of the adoptive parent based upon psychological bonds established during the period of foster care. Just as the relationship between adoptive parents and adoptive children should be protected from post-adoption disruptions by biological parents who have surrendered children for adoption, it must also be protected against post-adoption disruptions from foster parents or other third parties, particularly when these individuals did not oppose the adoption or seek to reserve any rights under the adoption decree.

Allowing Ken to establish psychological parent status based upon time he served as a foster parent is also inconsistent with the basic premise of our foster care and adoption programs. Discussing the related concept of "de facto parent" status, the American Law Institute has cautioned, "[r]elationships with foster parents are ... generally excluded ... because inclusion of foster parents would undermine the integrity of a state-run system designed to provide temporary, rather than indefinite, care for children." [36]

Ascertaining whether a foster parent has attained psychological parent status also presents special difficulties. As we stated in *Carter v. Brodrick,* the psychological parent is one who "love[s], value[s], appreciate[s], and view[s] as an essential person" the child for whom he or she is caring.[37] A foster parent serves a vital but inherently temporary role in a child's life. The ultimate goal in foster care is for the child to either be returned to the biological parents in appropriate circumstances or adopted, either by the foster parents or by another third party. The temporary nature of foster care along with the compensation for services associated with it make it more difficult to ascertain whether a foster parent has become a psychological parent or is serving the child's needs in a different capacity.

Given these considerations, we hold that the superior court was correct not to consider the time prior to the entry of the adoption decree for purposes of determining whether Ken was Simon's psychological parent.

Kattaryna is correct that the time Ken served as Simon's foster parent may not be considered for purposes of establishing psychological parent status, but she is incorrect that Ken is barred from subsequently establishing such status. The adoption decree gave Ken a clean slate upon which to establish psychological parent status. While it made Ken a "stranger" to Simon in the eyes of the law as of the moment of the adoption, in this case that moment was short-lived.[38]

---

**34.** Because Ken argues psychological parent status to meet the "clear detriment" requirement in his claim for third party custody, the evidentiary burden he must meet to establish this status is "clear and convincing evidence." *Evans,* 88 P.3d at 1085 (holding that "a heightened standard of proof is appropriate in initial custody contests between parents and non-parents," and "that the heightened standard should be a clear and convincing evidence standard.").

**35.** *See* AS 25.23.130. There is a spousal exception for instances where a stepparent who is married to the natural parent adopts the natural parent's child. *Id.*

**36.** ALI Principles of the Law of Family Dissolution § 2.03 comment c(ii).

**37.** 644 P.2d 850, 853 n. 2 (Alaska 1982).

**38.** *See, e.g., In re Adoption of S.K.L.H.,* 204 P.3d 320, 326 n. 23 (Alaska 2009) ("AS 25.23.130(a) clearly provides, however harshly, that the final [adoption] decree has the effect of making an adopted child a 'stranger' to the former relatives.") (internal citations omitted).

Kattaryna and Simon continued living together with Ken after the adoption and the superior court was obliged to evaluate the nature and quality of the relationship that Ken developed with Simon following the entry of the decree.

At least initially, Kattaryna promoted and fostered a relationship between Ken and Simon after the adoption. The custody investigator reported that Kattaryna, Simon, and Ken "still lived together as a family unit" after the adoption, a fact the superior court found significant. The superior court also pointed to a new will Kattaryna drafted in January 2007 as evidence that after the adoption she envisioned Ken "being in [Simon's] life." The will identified Ken (or Ken's relatives if Ken did not survive Kattaryna) as guardian and conservator of Simon, and left Kattaryna's interest in the parties' house to Ken.

Given Ken's continuing relationship with Simon, encouraged or at least accepted by Kattaryna, the difficult question before the superior court was whether or not Ken established psychological parent status in the period subsequent to the adoption.

### b. The superior court correctly ended its analysis at the point when Ken filed his complaint for custody.

■ The superior court concluded that the end of the relevant period for determining psychological parent status was when Ken filed his complaint for custody. Ken argues that the superior court erred as a matter of law by not considering any facts after Ken filed his complaint. We agree with the superior court.

There are important policy reasons why the parental status of parties to custody and

visitation cases should be fixed at the time they file suit: a third party should not be able to establish psychological parent status against the wishes of the legal parent as a result of court-ordered interim visitation. Interim visitation is meant to help maintain and promote already existing psychological parent-child bonds; it should not be converted into a tool for establishing such bonds. If courts considered the interim period, litigants in Kattaryna's position would have an incentive to withhold or oppose pre-trial visitation, a potentially harmful result to a child genuinely bonded to a third party psychological parent. Conversely, litigants in Ken's position would have an incentive to delay resolution of the case in the hope a psychological parent connection could be established by exercising visitation during the interim period. The latter result could also be harmful to the child, in addition to being contrary to the wishes of the legal parent. For these reasons, we hold that in third party custody or visitation actions, the relevant point in time for establishing psychological parent status is the time when a complaint for custody or visitation is filed.[39]

### c. It was not clearly erroneous for the superior court to decide that Ken failed to establish psychological parent status during the relevant time period.

■ The superior court "did not find [Ken] to be the psychological parent of [Simon], between the time of the adoption on December 28, 2006 and the date [Ken] filed the Petition for Custody on April 12, 2007." The court based its conclusion on three primary considerations. First, it concluded that the time period between the adoption and

**39.** Ken points to our ruling in *Evans* to support his argument that the superior court should have made its determination on psychological status based on his entire history with Simon up to the time of trial. In *Evans*, we vacated an award of custody and visitation to the grandparents of two half-brothers, ordering that if on remand the grandparents' visitation and custody could not be sustained on previously-admitted evidence, the superior court was to hold an evidentiary hearing to get updated facts. 88 P.3d 1078, 1091 (Alaska 2004). The issue in *Evans* was not the nature of the grandparents' relationship to the children—the superior court held they had not established psychological parent status, *Id.* at 1082—the issue was the ability of the children's biological parents to meet the children's physical, emotional and intellectual needs. *Id.* at 1080. The question of parental fitness or home environment is often an evolving assessment. If a parent has gone from being fit to unfit or the home environment has deteriorated over the course of litigation, a superior court may consider these changed circumstances when determining custody or visitation.

Ken's custody complaint—about three and a half months—was simply too short to establish psychological parent status. Second, it pointed to Simon's very young age at the time of separation—between nineteen and twenty months—as a factor weighing against establishing psychological parent status. Finally, the court emphasized the importance of the fact that Ken voluntarily agreed to let Kattaryna adopt Simon alone just three and a half months before filing his complaint for joint custody. We review a finding of psychological parent status for clear error.[40]

The superior court did not clearly err when it found that three to four months is not long enough to establish psychological parent status, particularly given Simon's young age.[41] As the custody investigator stated, "until a child is old enough to say 'she's my mom and he's my dad', it is guesswork to figure out who [the child] views as his psychological parent(s)." Furthermore, even though there is disputed evidence in the record suggesting it was Ken's intention to eventually adopt Simon, the superior court did not err when it considered Ken's decision not to adopt Simon when he may have had the chance to do so as weighing against his claim. We do not find the superior court's decision that Ken failed to establish psychological parent status at the time he filed suit for custody to be clearly erroneous. We do not accept Ken's invitation to reconsider whether a psychological parent seeking custody or visitation over the objections of a legal parent should be held to a different substantive standard or evidentiary burden than another third party seeking similar rights.

### 2. *Buness* and *Todd* are distinguishable from this case.

Ken argues that *Buness v. Gillen*[42] and *Todd v. Todd*[43] support his argument that it will be clearly detrimental to Simon if his bond with Ken is broken. We do not find either decision to be inconsistent with the superior court's ruling. The third party relationships that were at issue in *Buness* and *Todd* are both distinguishable from Ken's relationship with Simon. Most prominently, the third party relationships with the children in *Buness* and *Todd* were significantly longer than the relationship between Ken and Simon. In *Buness*, the third party seeking custody had been the child's stepfather and "primary care-giver and father figure" for ten years.[44] In *Todd*, the child's grandparents sought custody and they had been the child's primary caregivers for about seven years.[45] Ken's entire relationship with Simon was only twenty months in duration when he filed suit for custody, and only three and a half of those months post-dated the adoption decree. Another important distinction is that the children in *Buness* and *Todd* were significantly older than Simon; the third parties in *Buness* and *Todd* had raised the children in those cases throughout much of their childhood. In contrast, Simon was still a toddler when Ken filed suit for custody.

In light of these considerations, we do not find that the superior court was clearly erroneous in concluding that Ken failed to demonstrate by clear and convincing evidence that it would be clearly detrimental to Simon if Ken was not awarded custody.[46]

**40.** *Kinnard v. Kinnard*, 43 P.3d 150, 153 (Alaska 2002).

**41.** The American Law Institute standard for establishing "de facto parent" status requires that a person live with a child for "a significant period of time not less than two years." ALI Principles of Family Dissolution § 2.03, comment c(iv). We do not establish any minimum length of time for establishing psychological parent status, but we do agree with the ALI that "[t]he length of time that constitutes a significant period will depend on many circumstances, including the age of the child, the frequency of contact, and the intensity of the relationship." *Id.*

**42.** 781 P.2d 985, 989 (Alaska 1989).

**43.** 989 P.2d 141, 145 (Alaska 1999).

**44.** 781 P.2d at 989.

**45.** 989 P.2d at 145.

**46.** Ken's argument that remand is necessary on the issue of clear detriment because it is not possible to discern the basis of the superior court's decision also fails. Because we affirm the superior court's finding that Ken did not establish psychological parent status during the relevant period, and psychological parent status

### C. Ken Did Not Prove By Clear And Convincing Evidence That It Would Be In Simon's Best Interest To Order Visitation Over Kattaryna's Objection.

██ The superior court did not rule on Ken's request for third party visitation, which was argued by the parties below. Because this case already has a protracted history, because the parties need finality, and because Ken presented his case for visitation to the superior court, we resolve Ken's claim for visitation on the merits rather than remand for further proceedings.[47] We held in *Evans* that to obtain visitation over the objection of a legal parent, a third party must show by clear and convincing evidence that visitation is in the child's best interests.[48] This heightened burden of proof reflects our long-standing custodial preference for parents over non-parents.[49]

In *Evans*, we noted the statement from the plurality in the United States Supreme Court's decision *Troxel v. Granville* that special weight must be given to a fit parent's determination as to the desirability of visitation with third parties.[50] We concluded that a presumption of parental fitness to determine what is in a child's best interests could be ensured by requiring that a third party prove "by clear and convincing evidence" that such visitation "is in the best interests of the child."[51] The result of establishing this heightened standard, we concluded, was to "provide effective protection for a parent's choice, except where the choice is plainly contrary to a child's best interests."[52]

In this case, Kattaryna has repeatedly expressed her preference that Ken no longer have a role in Simon's life. She has actively told others that they are forbidden to refer to Ken as Simon's father. The psychological evaluator noted in a follow up report prepared shortly before trial that "[i]t remains clear, as it was at the time of my original evaluation, that Kattaryna wants Ken out of [Simon's] life."

This is a difficult case and it is a close question whether it would be in Simon's best interests to order visitation with Ken over Kattaryna's fervent objections. On one hand, there is evidence in the record of a close and loving relationship between Simon and Ken as of the time of trial. On the other, both the custody investigator and the psychological evaluator acknowledged Simon could be harmed by continued exposure to the toxic relationship between Ken and Kattaryna.[53] Ultimately, Ken's inability to es-

is Ken's sole argument for establishing clear detriment, remand is not appropriate.

**47.** *See, e.g., In re Estate of Johnson,* 119 P.3d 425, 436 n. 43 (Alaska 2005) ("Due to the lengthy delays in this case, we are reluctant to remand the case for further proceedings."); *State v. Kenaitze Indian Tribe,* 83 P.3d 1060, 1071 (Alaska 2004) ("[G]iven the long delays in this litigation . . . we are reluctant to remand to the superior court to carry out the same review that we have already conducted. We therefore think it is better in this case for us to consider the merits of whether the regulation is invalid, rather than remand to the superior court, with the potential for further appeals.").

**48.** *Evans v. McTaggart,* 88 P.3d 1078, 1089 (Alaska 2004).

**49.** *See, e.g., Turner v. Pannick,* 540 P.2d 1051, 1055 (Alaska 1975) (stating that "parental custody [is] preferable and only to be refused where clearly detrimental to the child"); *see also Kinnard v. Kinnard,* 43 P.3d 150, 154 (Alaska 2002) ("Even in custody disputes between parents and stepparents, the best interests standard is rejected in favor of the *Turner* parental preference."); *J.W. v. R.J.,* 951 P.2d 1206 (Alaska 1998) (apply-

ing the parental preference principle established in *Turner* to a custody dispute between a legal parent and a stepparent who had established psychological parent status).

**50.** *Evans,* 88 P.3d at 1089 (citing *Troxel v. Granville,* 530 U.S. 57, 70, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000)).

**51.** *Id.* We also found that visitation could be ordered over the objection of a legal parent if the court found by clear and convincing evidence that the parent was unfit to make visitation decisions. *Id.* at 1090. Ken has not alleged that Kattaryna is unfit to make visitation decisions, so we need not consider this here.

**52.** *Id.* at 1089.

**53.** As the custody investigator concluded, "[i]f [Kattaryna] is unable to accept [Ken] as [Simon's] father, then any kind of custody/visitation schedule has the great potential to create a horrific existence for [Simon] as he's the object of a lifetime of conflict between [Ken] and [Kattaryna]." Even Ken admitted to the psychological evaluator that "he has seriously considered bow-

tablish psychological parent status once again undercuts his chief argument—that removing Ken from Simon's life would be detrimental to Simon. We also disagree with Ken regarding the weight to be given to Kattaryna's unwillingness to foster his relationship with Simon; special consideration must be given to a fit parent's determination regarding the desirability of visitation with third parties.[54] Having considered the evidence presented at trial, we find that Ken did not meet his burden to prove by clear and convincing evidence that Kattaryna's preference that he no longer have a relationship with Simon is plainly contrary to the child's best interests.

### D. The Superior Court Did Not Err By Requiring Kattaryna To Repay A Loan From Ken's Parents Or By Not Crediting Her Loan Payments To Both Parties.

On cross-appeal, Kattaryna argues the superior court erred in finding that Ken's parents loaned $22,000 to Kattaryna and $22,000 to Ken. She argues the parties called and treated the payments "gifts." Ken disagrees and also argues the court erred by not crediting Kattaryna's loan payments to both parties.

▮ There is a rebuttable presumption that transfers of funds between close relatives are not actual debts.[55] We review the superior court's characterization of such transfers of funds as "loans" or "gifts" for clear error.[56]

▮ There is conflicting evidence as to whether the transfer of funds from Ken's parents were loans or simply gifts. Ken's parents issued "gift letters" stating "[n]o repayment of this gift is expected or implied either in the form of cash or by future services of the recipient," and Kattaryna testified she made payments out of a moral obligation only. Ken's mother testified the payments were interest-free and without a specific payment term, but that the payments were loans, and that the "gift" part of the transaction was making the loans interest-free and not requiring a specific payment term or schedule. She also testified they made similar loans to Ken's siblings, and the record contains documents showing payments made on those loans. Kattaryna made sixteen payments to Ken's parents, generally in installments of $250, and wrote "home loan" on her checks. Ken testified the payments from his parents were loans and that Kattaryna's installments were payments made on behalf of both of them because he was paying the mortgage.

The presumption that transfers of funds between close relatives are not actual debts is rebutted in this case by weightier evidence that the money from Ken's parents was intended to be repaid. We conclude that the court did not clearly err in finding the payments from Ken's parents were legally enforceable loans.[57]

▮ We also conclude the superior court did not clearly err by crediting Kattaryna for the loan payments she made, and by

ing out of [Simon's] life if it is determined that Kattaryna would be unable to cooperate with him in coparenting [Simon]," although "he loves [Simon] and does not want to do this."

54. We consider "the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child" in a custody dispute between two parents. AS 25.24.150(c)(6) But this is not a dispute between two parents. Consistent with our opinion in *Evans*, the parental preference may only be overcome if it is determined, by clear and convincing evidence, that it would be in the best interests of the child to award third party visitation.

55. *Ware v. Ware*, 161 P.3d 1188, 1192 (Alaska 2007) (quoting *Dixon v. Bradsher*, 779 S.W.2d 727, 732 (Mo.App.1989)); *Fortson v. Fortson*, 131 P.3d 451, 462 n. 34 (Alaska 2006) (citing Charles C. Marvel, Annotation, *Unexplained Gratuitous Transfer of Property From One Relative to Another as Raising Presumption of Gift*, 94 A.L.R.3d 608 (1979); 59 Am Jur.2d *Parent and Child* § 92 (2002)).

56. *See Fortson*, 131 P.3d at 461 (upholding finding that loans from former wife's parents were not legally enforceable).

57. *See id.* at 462 ("The trial court is the factfinder, and given the evidence in the record supporting its decision [that payments from the former wife's parents were gifts], we cannot say that its finding that the loans were not marital debts was clearly erroneous.").

not crediting Ken for the mortgage payments.[58] "[P]roperty accumulated during cohabitation should be divided by determining the express or implied intent of the parties."[59] Although Ken testified that Kattaryna made payments on the parents' loans for both of them because he was paying the mortgage, the record shows the loans were made to Kattaryna and Ken individually. The record also supports the superior court's factual finding that the parties intended Ken to pay the mortgage, and that Kattaryna would pay utilities and incidentals because Ken had a higher income. The court's property division was in accord with the parties' intentions, as reflected in the record.

### E. The Superior Court Did Not Err By Granting Kattaryna Interim Attorney's Fees.

■ Ken argues on appeal that the superior court abused its discretion when it ordered him to pay Kattaryna interim attorney's fees. He argues the court made no findings to support this decision and claims that the fact he has lived in the house throughout the litigation does not support awarding Kattaryna interim attorney's fees.

The court reduced its original award of interim fees from $10,000 to $5,000, finding the award justified because Ken had a greater income and occupied the home—the parties' "largest and only significant equity"—throughout the action.

■ "[I]n actions between unmarried couples that resemble divorce proceedings the rules governing the award of attorney's fees in divorce cases will be applied."[60] In such cases, "an award of costs and fees is based on the relative economic situations and earning powers of the parties."[61] The purpose of such awards is to ensure the parties can litigate on a "fairly equal plane."[62] We review an interim attorney's fee award in divorce-like proceedings for abuse of discretion and will not reverse the award "unless it is arbitrary, capricious, manifestly unreasonable, or stems from an improper motive."[63]

Here, the court did not abuse its discretion in awarding Kattaryna $5,000 in fees. Contrary to Ken's assertion, the court made findings and its findings were relevant to the determination. It considered the parties' respective incomes and other sources of equity, including Ken's continued possession of the house, the parties' sole significant asset. The record supports these findings. The court's findings were not clearly erroneous, it considered appropriate factors, and the award was not arbitrary, capricious, or manifestly unjust.

### F. The Superior Court Should Have Provided Notice To Ken Before Issuing A Writ Of Assistance To Kattaryna.

■ Ken contends the superior court's communication with opposing counsel following its oral ruling and its issuance of a writ of assistance outside of his presence was error.

The purpose of the court's proceedings on August 22, 2008 was to issue the court's oral ruling on record. While no notice was sent to counsel, the date for the decision on the record appeared on the CourtView calendar, which both parties could access. Kattaryna's counsel saw the date on CourtView and attended. Ken and his counsel did not have

---

**58.** The superior court found the parties intended to own the house equally, although it recognized the payments had been unequal. It credited Ken for home improvements. It ordered the parties to refinance and to split those costs equally. It concluded that ultimately, Ken would be entitled to $78,883.75 in equity and Kattaryna to $50,132 (taking into account the improvement credit to Ken and the debt to his parents), less half the refinancing costs.

**59.** *Bishop v. Clark*, 54 P.3d 804, 811 (Alaska 2002) (quoting *Wood v. Collins*, 812 P.2d 951, 956 (Alaska 1991)).

**60.** *Id.* at 813 (citing *Bergstrom v. Lindback*, 779 P.2d 1235, 1238 (Alaska 1989)). AS 25.24.140(a) permits a court to award interim attorney's fees to a spouse.

**61.** *Bergstrom*, 779 P.2d at 1238 (citing *L.L.M. v. P.M.*, 754 P.2d 262, 263–64 (Alaska 1988)).

**62.** *Sanders v. Barth*, 12 P.3d 766, 769 (Alaska 2000) (citing *Lone Wolf v. Lone Wolf*, 741 P.2d 1187, 1192 (Alaska 1987)).

**63.** *Koller v. Reft*, 71 P.3d 800, 808 (Alaska 2003) (citing *Zimin v. Zimin*, 837 P.2d 118, 124 (Alaska 1992)).

notice and they were not present. There is no evidence that the court intended to address the issue of a writ of assistance at these proceedings—this issue came up when Kattaryna's counsel asked if the court was going to issue an order for the return of Simon. But the court ended up granting Kattaryna's request for a writ of assistance without providing an opportunity for Ken to be heard. Ken is correct that the writ of assistance should not have been issued under these circumstances. As Ken notes, however, "the damage has been done." Ken did not request additional relief.

## IV. CONCLUSION

For the reasons stated above, with the exception of the court's issuance of a writ of assistance, the decisions of the superior court are AFFIRMED.

EASTAUGH, Justice, not participating.