NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| BETTY JO MOORE, | ) |
| | ) Supreme Court No. S-17325 |
| Appellant, | ) |
| | ) Superior Court No. 1JU-17-01006 CI |
| v. | ) |
| | ) MEMORANDUM OPINION |
| CRYSTAL KETAH and JEFF KETAH, | ) AND JUDGMENT* |
| | ) |
| Appellees. | ) No. 1783 – July 29, 2020 |
| | ) |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Juneau, Amy Mead, Judge.

Appearances: Anthony M. Sholty, Faulkner Banfield, P.C., Juneau, for Appellant. Nicholas A. Polasky, Juneau, for Appellees.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

## I.    INTRODUCTION

A grandmother appeals the superior court's denial of her petition for court-ordered visitation with her grandchildren over their parents' objection. The superior court found, after an evidentiary hearing, that the parents were fit to make decisions in their children's best interests and that their decision to distance themselves from the grandmother, whom they believed to have a "toxic" effect on the family, was not so contrary to the children's best interests as to be detrimental to them. We conclude that

---

\*      Entered under Alaska Appellate Rule 214.

the superior court's factual findings are not clearly erroneous and that they are sufficient to support the denial of the grandmother's petition; we therefore affirm the superior court's decision.

## II.    FACTS AND PROCEEDINGS

Betty Jo Moore lives in Sitka and has two young grandchildren, now aged nine and six. The grandchildren live in Juneau with their parents, Jeff Ketah (Moore's son) and his wife Crystal. The Ketahs used to live in Sitka as well; the trial court found that the grandchildren had a "close and loving" relationship with their grandmother during that time. Moore "regularly cared for both children, at the Ketahs' request, and had frequent visits. She and the children would go for walks, go to the library, play at home, pick berries, go to the park, etc."

In 2016 Jeff and Crystal moved to Juneau "to focus on [their] core family unit." After the move, Moore's contact with her grandchildren became more sporadic. She visited them in Juneau, and the Ketahs stayed with her when they visited Sitka. But things gradually changed. The Ketahs' relationship with Moore began to sour; they believed that Moore was "manipulative" and had a "toxic" effect on their family.

Moore tried to remain connected to her grandchildren, but the Ketahs limited her contacts. In November 2017 Moore, through her attorney, sent a letter to the Ketahs requesting a formal visitation schedule. The letter proposed regular visits and phone calls with the grandchildren, the freedom to send them gifts (with the assurance they would be delivered), and regular updates with "pictures and other news." The letter asked for a response or counterproposal within a few weeks, suggested mediation if there was no "agreement by the end of the month," and alluded to the possibility of a lawsuit. The Ketahs did not respond.

When Moore's deadline passed, she filed a petition in superior court seeking an order for grandparent visitation pursuant to AS 25.20.065. She alleged that the lack of visitation was detrimental to the grandchildren.

A few months after filing suit, in January 2018, Moore sent Jeff another letter. Moore thanked Jeff for a recent phone call that included a talk with the grandchildren, as well as some pictures and a video. But she said she wanted to talk to Jeff and Crystal in the future only to arrange visits with the grandchildren, and any other "questions or communication . . . regarding [the] grandchildren" should be directed to her attorney. She also expressed her desire that the grandchildren not be subjected "to any negative verbal or non-verbal communications" about her. Following this letter, Moore and the Ketahs had no contact outside the lawsuit.

In the fall of 2018 the superior court held a two-day bench trial on Moore's petition. Jeff and Crystal testified that their relationship with Moore had always been difficult and was further strained by a dispute over the transfer of Moore's individual fishing quota (IFQ) permits to Jeff.[1] Crystal testified why she opposed court-ordered visitation with Moore: "I do not want a court to tell me that I have to expose my children to someone that has displayed themselves as divisive and manipulative, and I feel it's my right to protect my kids from that." The Ketahs also testified that their children were not suffering from their lack of contact with their grandmother; the children were "thriving" and "continuing to do well" in Juneau. Crystal's sister testified, "They're very smart, well-adjusted children, very friendly, have great manners, . . . both very active, good kids, really well-rounded kids."

---

[1] *See generally Ferguson v. Ferguson*, 928 P.2d 597, 598-99 (Alaska 1996) (summarizing IFQ program).

In Moore's testimony she acknowledged her strained relationship with the Ketahs, but she attributed the strain primarily to the IFQ dispute, which she did not believe should be allowed to interfere with her relationship with her grandchildren. Moore's friends testified that she was an "amazing" grandmother who had an "unconditional, instant, [and] strong bond" with her grandchildren. To support her claim that the Ketahs were unfit parents who should not be presumed to be acting in their children's best interests, Moore described several incidents from about two years earlier which she believed demonstrated that Jeff had a substance abuse problem and that the Ketahs had a history of domestic violence. The Ketahs did not dispute the basic facts of these incidents, but they both testified that their relationship had improved greatly in the intervening years; Crystal testified that without interference from Moore they had been "able to focus on [them]selves and [their] relationship."

After hearing the evidence, the superior court denied Moore's petition. The court found that the Ketahs were fit parents and that Moore had failed to prove that a lack of grandparent visitation was detrimental to the children. The court concluded that the Ketahs' withdrawal from Moore for a time in order to heal their family dynamic was not unreasonable and that granting Moore's petition over the Ketahs' objection would infringe upon their constitutional right to "oversee and direct the upbringing of their children." Moore appeals.

III. STANDARD OF REVIEW

"[W]hether factual findings are sufficient to support an award of custody [or visitation] to a third party is a legal issue to which we apply our independent judgment."[2] We review factual findings to determine if the superior court's

---

[2] *Ross v. Bauman*, 353 P.3d 816, 823 (Alaska 2015) (second alteration in original) (quoting *Osterkamp v. Stiles*, 235 P.3d 178, 183-84 (Alaska 2010)).

" 'controlling findings of fact are clearly erroneous.' 'A factual finding is clearly erroneous when a review of the record leaves a definite impression that a mistake has been made.' "[3]

## IV. DISCUSSION

Alaska Statute 25.20.065 allows a grandparent to petition for "reasonable rights of visitation" with a grandchild. The statute conditions an award on proof that "(1) the grandparent has established or attempted to establish ongoing personal contact with the child; and (2) visitation by the grandparent is in the child's best interest."[4] In addition, in order to better protect parents' fundamental constitutional right to direct their child's upbringing, we held in *Ross v. Bauman* that a grandparent must also "prove by clear and convincing evidence that it is detrimental to the child to limit visitation with the third party to what the child's otherwise fit parents have determined to be reasonable."[5]

The superior court's findings of fact show that Moore satisfied the first statutory requirement by establishing a "close and loving relationship with the children while they were in Sitka" and attempting to maintain that relationship once the Ketah family moved to Juneau. As for the second element, the superior court did not expressly make a best interests determination, though it noted that it was "not unreasonable to assume . . . that both kids would benefit from having a relationship with a grandmother who dotes on them."

Moore focuses her argument on the element we articulated in *Ross*: that "it is detrimental to the child[ren] to limit visitation with the [grandparent] to what the

---

[3]      *Hawkins v. Williams*, 314 P.3d 1202, 1204 (Alaska 2013) (citation omitted) (quoting *Osterkamp*, 235 P.3d at 183).

[4]      AS 25.20.065(a).

[5]      353 P.3d at 828-29.

child[ren]'s otherwise fit parents have determined to be reasonable."[6] Analysis of this element has two components: an evaluation of the parents' fitness and a showing that the parents, although "otherwise fit," made a decision about visitation that was "detrimental to the child[ren]."[7] We address fitness first, reviewing for clear error the superior court's finding that the Ketahs were fit parents.

A fit parent is one who "adequately cares for his or her children."[8] Moore asserted that domestic violence and substance abuse made the Ketahs unfit, basing her argument primarily on two events that took place almost two years before the evidentiary hearing. First, she pointed to text messages from November 2016 in which Crystal told her that Jeff had passed out after drinking all day and woke up "very angry," and that Crystal had taken the children into the bedroom to get away from him. In the text messages Crystal said that Jeff "[got] like this whenever he [drank] all day," but she testified at the hearing that this happened only three or four times during their marriage and all before the end of 2016.

Moore also relied on an incident a few months later during a family vacation, when Crystal and Jeff argued and she kicked him in the face. Neither Moore nor the children witnessed the parents' fight, but Moore asserted that the older child told her about it later in the day and seemed "subdued" and "upset."

The superior court found, however, that there was no evidence these

---

[6] *Id.*

[7] *Id.*

[8] *Id.* at 827 n.39 (quoting *Troxel v. Granville*, 530 U.S. 57, 68-69 (2000) (plurality opinion)).

incidents harmed the children[9] and that the allegations of intoxication did not rise "to a level that could be argued would be detrimental to the children." The court also found that the vacation incident occurred during a low point in the Ketahs' marriage, when tensions were exacerbated by Moore's presence, and that there was no history of domestic violence between Jeff and Crystal. We see no clear error in the court's finding that this evidence did not meet the clear and convincing standard necessary to prove parental unfitness.

"[T]here is a presumption that fit parents act in the best interests of their children."[10] As we held in *Ross*, however, fit parents' preferences may be overridden "when they are so clearly contrary to a child's best interests that they are detrimental to the child."[11]

Moore urged the superior court to adopt the inference that the "abrupt removal of a grandparent from the lives of grandchildren with whom she has a close and loving relationship . . . is detrimental to the grandchildren." The court responded by noting that "parents move away from grandparents often," and therefore separation could not "be enough, standing alone, to justify a finding of detriment under the [*Ross*] test." The court therefore looked for other evidence of detriment and found none, observing

---

[9] We note that the court's observation that there was no testimony the children "were ever aware that [the second incident] happened" is contradicted by Moore's testimony that the older child told her about it. The court also found that the incident "did not cause injuries," whereas Moore testified that it left "a great big red mark" on Jeff's face. But it was the trial court's province to determine the credibility of this testimony, and we will not disturb its evident conclusion that Moore's description of the event was not convincing. *See Jill Y. v. Casey Y.*, 463 P.3d 833, 841 (Alaska 2020).

[10] *Ross*, 353 P.3d at 827 (quoting *Troxel*, 530 U.S. at 68).

[11] *Id.* at 829.

that Moore had not introduced "any evidence that [the grandchildren were] anything less than [what] their parents describe[d]: two happy, well-adjusted kids."

Ultimately it was Moore's burden to prove by clear and convincing evidence that the parents' preferences — here, to limit contact with Moore until their relationship could heal — were so clearly contrary to the children's best interests that they were detrimental to the children.[12] As the superior court noted, Moore presented no evidence on this issue, relying instead on the inference of detriment common to all similar relationships disrupted by geographical separation. We cannot say that the superior court clearly erred by deciding that Moore had failed to carry her heavy burden of overcoming the presumption that these fit parents made this decision in their children's best interests.

Lastly, Moore contends that her case is novel in that her relationship with her grandchildren has not been merely limited but entirely "eliminated." She points to decisions from other states in which courts have explicitly considered the amount of contact between children and the petitioner as relevant to the reasonableness of the parents' decision,[13] and she urges us to do the same.

---

[12]     *Id.* at 828-29.

[13]     *See, e.g.*, *In re C.S.N.*, 14 N.E.3d 753, 757 (Ind. App. 2014) (reversing trial court's order granting grandparent visitation rights over fit parent's objections and explaining that one of four factors court must consider is "whether the parent has denied visitation or has simply limited visitation" (quoting *McCune v. Frey*, 783 N.E.2d 752, 757 (Ind. App. 2003))); *In re A.L.*, 781 N.W.2d 482, 488-89 (S.D. 2010) (reversing trial court's order granting grandparent visitation rights over fit parents' objections and noting that court is required to consider, among other things, "whether the parent has completely denied visitation or simply limited visitation").

Our law does not expressly require consideration of that issue.[14] And we need not decide its relevance here, because, as the superior court found, the Ketahs "are not opposed to their children having contact with [Moore] in [the] future, but believe that should not occur until their relationship [with Moore], which they view as currently unhealthy, . . . has healed." The evidence supports this finding; Crystal testified that she intended her children to resume their relationship with Moore "[e]ventually with time," but they first needed "[t]o create space and boundaries" and heal from the current stresses and resentment. The court's finding that the Ketahs had no intention of eliminating visitation altogether is not clearly erroneous.

## V. CONCLUSION

We AFFIRM the superior court's denial of Moore's petition for visitation rights.

---

[14] *See* AS 25.20.065; *Ross*, 353 P.3d at 828-29.