*Notice: This opinion is subject to correction before publication in the Pacific Reporter. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| TONG VANG, Appellant, | Supreme Court No. S-18337 |
| v. | Superior Court No. 3AN-21-04608 CI |
| PA KOU XIONG, Appellee. | O P I N I O N |
| | No. 7662 – June 30, 2023 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Dani Crosby, Judge.

Appearances: Joe P. Josephson, Josephson Law Offices, LLC, Anchorage, for Appellant. Richard A. Helm, Law Office of Richard A. Helm, Anchorage, for Appellee.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

CARNEY, Justice.

## I. INTRODUCTION

Tong Vang and Pa Kou Xiong were in a three-year relationship and have two children together. They were married according to the customs of the Hmong culture but never legally married. Upon dissolution of the relationship, the superior court determined that Vang owed Xiong $38,000 in damages for three unpaid loans made to Vang and his family during the relationship. Vang now argues the superior court should have resolved the dispute "in light of domestic relations law principles."

Specifically he argues the court should have applied a presumption treating the transfer of funds between "close relatives" as gifts. Because both parties conceded they were not legally married and neither party sought to establish a domestic partnership at trial, we decline to apply the presumption. And because the record supports the superior court's finding that Xiong intended the transfers of money to be loans, as well as the court's other factual findings, we affirm the superior court's judgment.

## II. FACTS AND PROCEEDINGS

### A. Facts

Vang and Xiong entered into a relationship in 2018 and were married according to the customs of the Hmong culture in 2019; they have two children. They never legally married and separated in early 2021.

Xiong subsequently filed for custody of the children and for damages, seeking repayment of $38,000: $3,000 she loaned Vang to make payments on his mother's life insurance policy; $30,000 she loaned him to help pay for his mother's funeral; and $5,000 she alleges was sent to Vang's sister without permission. Vang disputed her claims and counterclaimed for damages, alleging Xiong retained proceeds from his mother's insurance policy and took jewelry belonging to him.

### B. Proceedings

The superior court held a three-day trial, during which the parties produced conflicting evidence and testimony regarding their finances and the payments.

#### 1. Xiong's testimony

Xiong testified first. She testified that she loaned Vang $3,000 to pay for his mother's life insurance and that Vang told her he would pay her back either from his own funds or from the eventual life insurance payment. She similarly testified that, after Vang's mother died, she loaned his family $30,000 for the funeral. Again she testified that she expected to be paid from the life insurance payment and added that his family members assured her she would be repaid. And finally she testified that Vang, without her permission, wrote a $5,000 check from her bank account to his sister in

order to help his sister purchase a house. She testified that the memo line for the check — "for mom insurance" — referred to how she would be repaid.

Xiong explained that she and Vang had separate finances and that she had accumulated significant savings from her employment, parents, and wedding gifts. Of the $30,000 she loaned Vang for his mother's funeral, she stated that $20,000 was from her savings and another $10,000 was from money that was hers but that her parents had been holding for her. She also testified and provided evidence showing that the couple opened a joint account for an expected payment of $50,000 from the life insurance policy, but that Vang emptied the account. Finally she testified that the jewelry that was the subject of his counterclaim had been given to her.

**2. Xiong's family's testimony**

Xiong's mother also testified. She corroborated Xiong's account, saying Xiong informed her two of the payments were loans she expected to recoup. She also testified that she warned Xiong not to make the payments because she did not think Vang could or would pay her back. She confirmed the wedding gifts held by her and Xiong's father were given only to Xiong and not to the couple together. Finally she agreed with Xiong's accounting of the jewelry.

Xiong's brother's testimony was similar. He testified that he helped retrieve the $10,000 being held by his parents on Xiong's behalf and agreed that those funds were always considered Xiong's money. He also testified that he was told in Vang's presence that the funeral payment was a loan. He supported his mother's and sister's testimony regarding the jewelry.

**3. Vang's testimony**

Vang testified next, disagreeing with Xiong's account. He did not address the $3,000 payment but disagreed with her account of the $30,000 payment. He testified that his mother's funeral was paid for by another, larger life insurance policy. He stated that he had intended to hold leftover proceeds from that payment on behalf of

several of his siblings, but that at Xiong's request, he let her control those funds, and she wrongfully retained them. He also testified that Xiong agreed with the $5,000 payment to his sister, which he indicated was initially paid for from the insurance proceeds but was then reimbursed from his mother's estate. He testified that the note on the memo line incompletely showed the source of the funds. He also testified about the jewelry he claimed was his, and suggested that he and Xiong could split the wedding gifts.

**4. Vang's family's testimony**

Vang's uncle also testified. He testified that in Hmong culture, wedding gifts on the bride's side are given to the couple together and that if a wife initiates the divorce, "then she must split that money evenly among them." He also testified that he collected $29,000 in gifts from the bride's side. And he testified generally about the expenses associated with a traditional Hmong funeral but he did not know the exact breakdown of costs for Vang's mother's funeral or where the funds came from.[1]

Vang's sister testified next. She stated that she had taken out, initially paid for, and managed a $100,000 life insurance policy in anticipation of the funeral. She testified that Vang was the beneficiary of a second $50,000 policy that had been taken out to provide for their younger siblings. She testified that after she received the payment from the larger policy, she sent two payments totalling $34,000 for the funeral. She testified that about $10,000 was split between the siblings, that she personally gave Xiong $3,600 of that to be held for some of the younger siblings, and that Xiong kept this money after the couple separated. She testified that she kept about $40,000 from the policy. When questioned by counsel and the court, she could not provide exact

---

[1] The superior court, while on record, attempted to contact the organization that arranged the funeral and determine exact expenses. Vang's uncle submitted an invoice from the organization for $28,895, and witnesses testified that significant additional costs were incurred without documentation.

amounts of funeral expenses but testified that other relatives contributed money and estimated the total cost was around $50,000.

Another of Vang's sisters testified about the $5,000 check she received. She indicated the money was her share of the life insurance payment and was "never for a down payment for a house." She declined to tell the court how she used the money, instead telling Xiong's attorney that "it's my own personal matter and I can use it however I want to."

**5. Xiong's rebuttal**

Xiong testified in rebuttal and provided a more detailed breakdown of funeral expenses, estimating that the total cost was around $55,000. She reiterated that the wedding gifts were "only given to me," though she acknowledged that wedding traditions could vary from family to family. She testified some more about the jewelry Vang claimed was his, and denied that she had money belonging to Vang or his siblings, saying their shares of the insurance payment were spent immediately on various purchases. Xiong again testified that she did not approve of the $5,000 check, that she and Vang opened a joint account to hold the insurance proceeds, that some of the proceeds were supposed to be a repayment for her loans, and that Vang took this money.

**6. The superior court's order**

After both parties provided written closing arguments, the superior court issued an order and subsequently a judgment awarding Xiong full damages plus interest and fees. In a footnote the court "note[d] that neither party attempted to prove a domestic relationship" and instead "acknowledged that they were not legally married" but were instead "culturally married."

The court found that Xiong was credible with respect to the $3,000 that she asserted was a loan. The court also observed that Vang had not contradicted her testimony.

Turning to the $30,000 loan, the court noted its initial skepticism that Xiong would have been able to make such a large loan but stated it had been persuaded by her credible testimony about her savings. The court also acknowledged initial doubts about Xiong's account of the funeral but ultimately found that "the testimony . . . fit Ms. Xiong's version of events rather perfectly." It emphasized that Vang's sister, who held the larger insurance policy, testified to sending only $25,000 for funeral costs despite also testifying that the funeral likely cost around $50,000. Because Vang and his family had testified about leftover proceeds, the court concluded there must have been a loan to close the gap. The court also credited Xiong's testimony that the wedding gifts belonged to her — noting that they were held by her family — and that she "expected to be repaid."

Regarding the $5,000 loan, the court credited Xiong's testimony because it found that Vang's testimony was inconsistent with his sister's. The court did not believe that Xiong had kept insurance proceeds meant for Vang's siblings and concluded that Vang owed Xiong $38,000.

Finally, the court concluded that of the three pieces of jewelry in Vang's counterclaim, one belonged to Xiong, one belonged equally to both parties, and the existence of the third had not been established.

**7. Appeal**

Vang appeals, alleging the superior court committed legal error by treating the couple as unrelated and arguing that it should have treated them as spouses, "close relatives," or domestic partners. He asks us to vacate the judgment and remand for consideration in light of our presumption that "transfers of funds between close relatives" are gifts. He also challenges the court's factual findings regarding the payments as clearly erroneous.

## III. STANDARD OF REVIEW

We review factual findings, including "the . . . characterization of . . . transfers of funds as 'loans' or 'gifts,' " for clear error.[2] A superior court's determination of a party's intent when making a payment is also reviewed for clear error.[3] "We afford particular deference to factual findings based primarily on oral testimony, because the trial court is better suited to judge the credibility of witnesses and weigh conflicting evidence."[4]

But "classification decisions based on statute, contract, or intent are applications of law to fact reviewed de novo."[5] And the legal classification and definition of relationships like marriages and domestic partnerships are legal questions to which we apply our independent judgment.[6]

## IV. DISCUSSION

### A. Vang Did Not Establish That The Gift Presumption Applies.

Vang argues that he and Xiong were either married, in a domestic partnership, or "close relatives," and as a result any transfers of money between them must be presumed to be gifts. Xiong responds that they were not legally married and that Vang failed to raise the domestic partnership issue at trial. She does not address whether they are "close relatives" but argues that the presumption does not apply and, in the alternative, that it was rebutted.

We have discussed the gift presumption on three occasions. In *Fortson v. Fortson* we simply observed that "courts commonly view loans between family

---

2 *Osterkamp v. Stiles*, 235 P.3d 178, 183, 191 (Alaska 2010).

3 *See Wright v. Dropik*, 512 P.3d 655, 663 (Alaska 2022).

4 *Kristina B. v. Edward B.*, 329 P.3d 202, 207 (Alaska 2014).

5 *Tomal v. Anderson*, 426 P.3d 915, 923 (Alaska 2018).

6 *See id.* at 922 n.7; *Batey v. Batey*, 933 P.2d 551, 552-53 (Alaska 1997).

members with suspicion, and thus apply [a] rebuttable presumption that loans between close relatives are not actual debts."[7] In *Ware v. Ware*, a case that did not involve putative spouses or domestic partners, we "adopt[ed] the majority view that transfers of property . . . from parent to child are presumptively gifts."[8] And in *Osterkamp v. Stiles* we applied the "rebuttable presumption that transfers of funds between close relatives are not actual debts."[9] In that case parties in a domestic partnership received money from one of the partners' parents.[10] We affirmed the superior court's conclusion that evidence of the parties' conduct (repaying the loan despite a document that stated no repayment was needed) demonstrated that the transfer of money had been made as a loan, with the expectation of repayment — rebutting the presumption that it was a gift.[11]

Vang argues somewhat interchangeably that he and Xiong were married, in a domestic partnership, or close relatives. In fact these designations are distinct, and only the last one — "close relatives" — is relevant to the gift presumption. But even if spouses or domestic partners could be considered "close relatives" for the purposes of the presumption,[12] Vang did not establish at trial that either of those designations applies.

---

[7] 131 P.3d 451, 462 n.34 (Alaska 2006) (citing Charles C. Marvel, Annotation, *Unexplained Gratuitous Transfer of Property from One Relative to Another as Raising Presumption of Gift*, 94 A.L.R.3d 608 (1979); 59 AM. JUR. 2D *Parent and Child* § 92 (2002)).

[8] 161 P.3d 1188, 1192-93 (Alaska 2007).

[9] 235 P.3d 178, 191 (Alaska 2010).

[10] *See id.* In *Osterkamp* there was no transfer of funds between the partners themselves. *See id.*

[11] *See id.*

[12] An updated version of the treatise cited in *Fortson* expressly states that the definition of "relative" excludes spouses or two people living together. Charles C. Marvel, Annotation, *Unexplained Gratuitous Transfer of Property from One Relative*

It is undisputed that Xiong and Vang were not legally married. To the extent Vang requests we independently recognize his cultural marriage to Xiong, such a request runs afoul of "expressly stated legislative intent."[13] And to the extent Vang makes a belated argument that he and Xiong were in a domestic partnership, that argument is inadequately briefed. Vang did not attempt to establish a domestic partnership at trial,[14] and as a rule, we do not consider issues first raised on appeal unless

---

*to Another as Raising Presumption of Gift*, 94 A.L.R.3d 608 n.7 (2021). And while we cited cases in *Ware* recognizing a gift presumption for spouses, *Ware*, 161 P.3d at 1192 n.10, that presumption is generally a separate one for trusts arising from purchases of real property for or on behalf of a spouse, *see, e.g.*, *Rakhman v. Zusstone*, 957 S.W.2d 241, 244 (Ky. 1997); *Durward v. Nelson*, 481 N.W.2d 586, 588 (N.D. 1992); *Detra v. Bartoletti*, 433 P.2d 485, 487-88 (Mont. 1967); *Jocoy v. Jocoy*, 562 S.E.2d 674, 675 (S.C. App. 2002).

[13] *Cf. Batey v. Batey*, 933 P.2d 551, 554 (Alaska 1997) (declining to "expand[] or alter[]" statutory definition to include putative marriages because AS 25.05.051 expressly intended "to provide a *comprehensive* marriage code for the state of Alaska" (alteration in original)). For a similar reason Alaska also does not recognize common law marriages more generally. *See Edwards v. Franke*, 364 P.2d 60, 63 (Alaska 1961).

Vang suggests that he failed to argue the applicability of marriage law principles because he assumed the superior court would apply them. While we recognize that both parties and the court used language reflecting the marriage-like nature of Vang and Xiong's relationship, we also note that Vang expressly conceded before trial that he and Xiong were not married.

We also conclude that Vang and Xiong were not in a putative marriage, as such a marriage requires at least one of the parties to have had a good faith belief that the marriage was legally valid at the time of the attempted marriage. *See Batey*, 933 P.2d at 553 (calling this "[t]he essential basis of a putative marriage"). The record contains nothing that would have allowed the superior court to make this finding.

[14] As the superior court noted in its order, "neither party attempted to prove a domestic partnership. Rather, the parties acknowledged that they were not legally married, and that their relationship was one of being culturally married according to Hmong practices."

certain standards are met.[15] Vang provides no explanation why we should consider his untimely argument; his argument is waived because it is inadequately briefed.[16]

Because Vang did not establish that he and Xiong were married or in a domestic partnership, we decline to remand for consideration of the gift presumption.

**B. The Superior Court's Factual Findings Were Not Clearly Erroneous.**

Vang makes a global challenge to "the sufficiency of the evidence" and argues that Xiong's exhibits "fail to demonstrate the validity of her claims." But the evidence — both the written exhibits and testimony at trial — provided the superior court sufficient basis to find Xiong's claims were valid. For example, Vang argues that Exhibit 7, showing the existence of a joint account, "contradicts and undermines [Xiong's] repeated oral testimony" about the couple's separate finances. This is incorrect. Xiong emphasizes that they kept their finances separate for the majority of the relationship and states that they "never" had a joint account. But the full meaning is clear in context: "We never shared a joint account. *The only time* we shared a bank account . . . was when his mom died and we went to open a joint account to put . . . his mom's life insurance money . . . , *but other than that*, we've never had a joint account at all."

The record also provides adequate support for the court's factual findings about the payments. Vang did not provide any testimony on the $3,000 loan at all. Regarding the $30,000 loan, Vang and his sister both testified that $34,000 from the insurance payment was spent on the funeral.[17] Though no one could establish exactly

---

[15] *See Ace Delivery & Moving, Inc. v. State*, 350 P.3d 776, 781-82 (Alaska 2015) (describing standards for discretionary review of otherwise waived issues).

[16] *State v. Pub. Safety Emps. Ass'n*, 257 P.3d 151, 165 (Alaska 2011).

[17] The superior court may have made a mistake in finding that Vang's sister sent only $25,000, even though Vang and his sister both testified that she sent $34,000.

how much the funeral cost, Vang's sister and Xiong both estimated that it was around $50,000. Vang and his sister also both testified that there were leftover proceeds after the funeral. The court, weighing this testimony, reasonably concluded that an additional payment bridged the gap. Even though Vang continues to dispute who spent the money and whose money it was,[18] he does not provide alternative numbers or reasoning. Regarding the $5,000 payment, Vang argues that the inconsistency between the testimony of him and his sister can be resolved. But the court reasonably concluded that their differing accounts at trial made Vang less credible.

The record also supports the superior court's conclusion that Xiong's payments were loans. "Whether the parties were in a domestic partnership or not, the nature of these payments — loan or gift — depends on the parties' intent."[19] The intent of parties is a factual finding.[20] In this case Xiong and her witnesses all testified that she intended to loan money to Vang, not give it to him. Xiong described her expectation that she would be repaid, bolstered by Vang and his family's reassurances. Xiong's

---

In fact Xiong seems to agree that Vang's sister sent $34,000. She simply clarified that $9,000 was immediately used to reimburse another sibling for other expenses. This left $25,000 available to spend. But erroneous findings are reversible only "when they are 'controlling,' [and] not if they are immaterial." *Pingree v. Cossette*, 424 P.3d 371, 377 (Alaska 2018). Because this miscalculation does not affect the superior court's underlying reasoning, we conclude it is immaterial.

[18] Vang now asserts that his sister transferred her insurance payment to him before the funeral and that he spent $34,000 on the funeral. But at trial he testified repeatedly that he only received and managed the $34,000 she sent. His sister similarly testified that she received the payment, sent two discrete payments for the funeral, distributed some of the excess, and kept the remainder herself. In any event the superior court's reasoning did not rely on who spent the money — rather the court found that $34,000 was insufficient to cover the estimated cost of the funeral, suggesting that Xiong provided a loan.

[19] *Wright v. Dropik*, 512 P.3d 655, 663 (Alaska 2022).

[20] *See id.* at 661.

mother similarly testified that Xiong told her two of the payments were loans. And Xiong's brother testified that he was told in Vang's presence that one of the payments was a loan. In contrast Vang and his witnesses did not testify about the intent behind two of the payments at all. Vang testified that Xiong approved of the $5,000 gift to his sister. But we defer to the superior court's determination that Xiong's testimony to the contrary was more credible.

The record supports both Xiong's claims and the court's findings, including its conclusion that Xiong intended her transfers of money to Vang to be loans.

## V. CONCLUSION

The superior court's judgment is AFFIRMED.