NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| WILD B. WILLIAMS, | ) | |
| | ) | Supreme Court No. S-18792 |
| Appellant, | ) | |
| | ) | Superior Court No. 3PA-21-02300 CI |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| RACHEL C. DANIEL, | ) | AND JUDGMENT[*] |
| | ) | |
| Appellee. | ) | No. 2076 – February 26, 2025 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Kari Kristiansen, Judge.

Appearances: Nathan T. Henshaw and Michael Gavrilis, Henshaw Law, Anchorage, for Appellant. No appearance by Appellee.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

## I.    INTRODUCTION

A mother wished to move out of state with her infant son, and both she and the child's father petitioned for sole legal and primary physical custody. Following an evidentiary hearing, the superior court found that the mother's stated reasons for moving were legitimate and that the child's best interests favored awarding her sole legal and primary physical custody. The court also determined several disputed

---

[*]    Entered under Alaska Appellate Rule 214.

property issues; as relevant to this appeal, it decided that the parties had no distributable interest in a Palmer property that had been purchased at a foreclosure sale by the mortgagee, the mother's father.

The child's father appeals both the award of custody and the court's finding that he lacked any interest in the Palmer property. Seeing no clear error or abuse of discretion, we affirm the superior court's judgment.

## II. FACTS AND PROCEEDINGS

### A. Facts

Wild Bill Williams and Rachel Daniel were involved in a three-year relationship and are the parents of a son born in April 2021. The parties separated that October. During their relationship Williams worked a two-week-on/two-week-off schedule on the North Slope, and Daniel worked primarily as a property manager for a firm owned by her father and based in Nashville, Tennessee. The couple's son had a significant health issue at birth; as the superior court explained it, his "skull was fused together and surgery was required to allow for brain growth."

The parties co-owned two properties: a house in Talkeetna, which included a small cabin, and a three-unit rental property in Palmer they had purchased from Daniel's father, who held the property's mortgage. Both Daniel and Williams invested time and money into turning the Palmer property into a bed and breakfast, but after they separated they stopped making the mortgage payments. Daniel's father eventually foreclosed on the property and purchased it at auction.

### B. Proceedings

#### 1. The parties' custody motions

In November 2021 Williams petitioned for sole legal and primary physical custody of the couple's son, alleging that Daniel had "committed acts of domestic

violence" that triggered the presumption against awarding her physical custody.[1] Daniel responded by alleging domestic violence on Williams's part and also seeking sole legal and primary physical custody. At the same time, she filed a "Motion to Relocate," explaining that she hoped to move to Kentucky[2] with the parties' son so that she could "be closer to her family who can provide support and assistance, to secure a well-paying job and live in affordable housing, to be close to her older son [from a prior relationship], and to be close to excellent medical facilities for" the infant son's continuing medical care. The court held evidentiary proceedings on the custody motions and some property issues over the course of eleven months and issued written findings of fact and conclusions of law shortly after the proceedings concluded.

### 2. The superior court's order

In its order the court first related the background of the parties' relationship and separation, then turned to Daniel's proposed move to Kentucky. The court found that she had legitimate reasons to move, including family connections, job opportunities, and access to health care for the couple's son.[3]

The court then discussed the statutory best interests factors courts are required to consider when deciding awards of child custody.[4] Relevant to the first

---

[1] AS 25.20.090(8).

[2] Daniel's intended residence was in Austin, Kentucky, about 50 miles northwest of Nashville, Tennessee. For convenience we generally refer to Kentucky as Daniel's destination, though we recognize that much of the relocation testimony was about the Nashville area more broadly.

[3] *See Mengisteab v. Oates*, 425 P.3d 80, 85 (Alaska 2018) (describing "two-step approach for determining best interests of a child in a custody dispute where one parent plans to relocate out of state with the child," the first step being "to determine whether the planned move is 'legitimate' " (quoting *Moeller-Prokosch v. Prokosch* (*Moeller I*), 27 P.3d 314, 316 (Alaska 2001)).

[4] AS 25.24.150(c).

factor, "the physical, emotional, mental, religious, and social needs of the child,"[5] the court found that the couple's child "has [had] physical problems since birth that will require attention for the foreseeable future"; the court did not explicitly weigh this factor in favor of either parent. Relevant to the next factor, however — "the capability and desire of each parent to meet these needs"[6] — the court found that Daniel was the parent who had been more involved in the child's medical care and more willing to keep the other parent informed about it; the court also found that the child "often" returned from Williams's custody "ill and in need of medical attention" for things such as rashes and weight loss. The court concluded that this factor favored Daniel.

The court found that the child's preference[7] was an irrelevant factor given his young age, thus favoring neither parent, and that both parents had "an existing relationship of love and affection with the child,"[8] meaning that this factor, too, favored neither parent. As for the next factor, regarding the need for stability and continuity in the child's life,[9] the court first observed that the parties were sharing custody "on a two-week rotation driven by Mr. Williams['s] work schedule." If Daniel moved away, however, and the child stayed in Alaska, the court found it "unclear who would take care of [the child] during Mr. Williams'[s] work weeks," whereas Daniel expected to have a work schedule in Kentucky that would allow her to care for the child "daily." The court found that this factor favored Daniel.

The court next considered "the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent

---

[5]     AS 25.24.150(c)(1).

[6]     AS 25.24.150(c)(2).

[7]     *See* AS 25.24.150(c)(3).

[8]     *See* AS 25.24.150(c)(4).

[9]     AS 25.24.150(c)(5) ("the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity").

and the child."[10]   The court found that Daniel had "a well-established history of allowing contact between [Williams and the child] during her custodial time," whereas Williams's corresponding history was "very poor."  It therefore found this factor to favor Daniel.

With regard to domestic violence,[11] the court noted that Daniel had filed a petition for a long-term domestic violence protective order and had alleged other instances of assault on Williams's part, but the court did not find her testimony credible; this factor therefore favored neither party.

The court next considered whether "substance abuse by either parent or other members of the household directly affect[ed] the emotional or physical well-being of the child."[12]  It found no credible evidence that Daniel had "alcohol issues," but it noted that Williams had "three DUI's, the last being a felony DUI," and found that his resulting "[l]ack of a driver[']s license could impact [his] ability . . . to provide for the daily needs of [the child], especially in emergency situations."  The court found that this factor favored Daniel.

The court then noted several other custody-related considerations.[13]  It first rejected allegations Williams had raised about Daniel's mental health.  It then observed that although Williams was "a felon and [was] barred from carrying, or possessing, firearms," several witnesses testified that he regularly carried a pistol, and he "invoked his Fifth Amendment right against self-incrimination when asked about

---

**10**     AS 25.24.150(c)(6).

**11**     AS 25.24.150(c)(7) ("any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household or a history of violence between the parents").

**12**     AS 25.24.150(c)(8).

**13**     *See* AS 25.24.150(c)(9) (allowing consideration of "other factors that the court considers pertinent" to custody award).

carrying firearms." The court found this troubling, reasoning that Williams's behavior placed him at risk of arrest "while caring for [the couple's child]," thus placing the child "at risk of harm while in [Williams's] care."

The court then described conflicts the parties had over personal property following their separation. Although Williams denied having taken any of Daniel's possessions following the separation, an Alaska State Trooper testified about a search of Williams's storage shed pursuant to a warrant, which uncovered "numerous items that belonged to Ms. Daniel, to include numerous tools with her name on them." The court considered this evidence as proof that Williams lacked the ability "to maintain an amicable relationship . . . or to communicate honestly with" Daniel, thus militating against an award of joint legal custody.

Finally, the court considered evidence that Williams had sold a car that Daniel depended on for transportation, in violation of "a Domestic Relations Procedural Order barring the [sale] of jointly owned property" and without regard for the effect on Daniel's ability to care for their child.

Weighing these factors, the superior court concluded that it was in the child's best interests to allow Daniel to move to Kentucky with the child, and it granted her sole legal custody and primary physical custody. Williams was awarded "liberal visitation," dependent on 14 days' notice. If Daniel decided not to move to Kentucky, custody would remain on the existing two-week rotation.

With regard to the single property issue raised on this appeal — the disposition of the Palmer property — the court found that because it was now owned by Daniel's father, who had bought it at auction following foreclosure, "[n]either party [had] an ownership interest in the property at this point that is available for assignment by the court."

Williams appeals. He challenges both the court's custody award and its finding that he lacked an ownership interest in the Palmer property.

## III. STANDARD OF REVIEW

"Superior courts are vested with 'broad discretion' in making child custody decisions,"[14] "and [the court's] determination will not be set aside unless the record shows that its controlling findings of fact are clearly erroneous or that the court abused its discretion."[15] "A finding of fact is clearly erroneous when this court is left with a definite and firm conviction that the trial court has made a mistake."[16]

## IV. DISCUSSION

### A. The Superior Court Did Not Err In Its Custody Award.

#### 1. The superior court did not clearly err by finding that Daniel's move was legitimate.

"In a custody decision when one parent intends to move from Alaska, the trial court must use a two-step process to determine the children's best interests."[17] The first step is determining "whether the planned move is 'legitimate,' which we have defined as 'not primarily motivated by a desire to make visitation more difficult.' "[18] The second step "is to determine what is in the best interests of the child in light of all relevant statutory best interests factors and the reasons for the relocation."[19] The

---

[14]   *Pingree v. Cossette*, 424 P.3d 371, 376 (Alaska 2018) (quoting *Vachon v. Pugliese*, 931 P.3d 371, 375 (Alaska 1996)).

[15]   *Blanton v. Yourkowski*, 180 P.3d 948, 951 (Alaska 2008) (citing *Borchgrevink v. Borchgrevink*, 941 P.2d 132, 134 (Alaska 1997)).

[16]   *Joy B. v. Everett B.*, 451 P.3d 365, 368 (Alaska 2019) (quoting *Hamilton v. Hamilton*, 42 P.3d 1107, 1111 (Alaska 2002)).

[17]   *Brett M. v. Amanda M.*, 445 P.3d 1005, 1009 (Alaska 2019) (citing *Saffir v. Wheeler*, 436 P.3d 1009, 1013 (Alaska 2019)).  We have referred to this two-step process as the "*Moeller-Prokosch* framework."  *See Saffir*, 436 P.3d at 1013 (citing *Moeller I*, 27 P.3d 314, 317 (Alaska 2001)).

[18]   *Mengisteab v. Oates*, 425 P.3d 80, 85 (Alaska 2018) (quoting *Moeller I*, 27 P.3d at 316).

[19]   *Id.* at 85-86.

superior court in this case properly applied the two-step process, first finding that Daniel's planned move was "legitimate and not motivated by a desire to make Mr. Williams['s] visitation . . . more difficult."

The court cited a number of reasons for Daniel's planned move: she could "benefit from a family support system in Kentucky"; "both she and [the parties' son could] spend more time with Ms. Daniel's older son," which in turn would allow her to share the older son's custody and allow "the two brothers to grow up together"; she could "support herself and her children" by "work[ing] full-time as a property manager," work that was "unavailable to her in Alaska"; and the parties' son could "receive local medical attention for his" particular needs.

Williams challenges all these factual findings, asserting that Daniel's real motive for moving was "a desire to secure primary physical custody." First, he contends that Daniel was well able "to earn an income and provide for herself in Alaska." He points to testimony that she had earned as much as $60-$70,000 working in Alaska for her father's property management company, was a weekend campground manager in Hope, "was a seasoned Airbnb host," had worked as a tour guide, and had trained as a firefighter.

But Daniel's testimony supports a finding that her job in Kentucky would be steadier and more certain than what she was doing in Alaska. She testified that she did not have "the ability to . . . work a traditional job [in Alaska] because of the lack of childcare and . . . [Williams's] work schedule." She explained that her monthly minimum salary at her father's investment firm was $1,500, with amounts over that dependent on projects often involving travel to the Lower 48. Operating the Talkeetna bed and breakfast was not permanent employment; campground hosting, firefighting, and acting as a tour guide are irregular and seasonal jobs. Our record does not contain much detail about her prospective employment in Kentucky. She described it as "[c]onsulting in Airbnb business development and construction management" with her

father's company, headquartered there, and she agreed with her counsel's suggestion that her job would allow her to both work and "spend ample time with" her son. On the basis of this record, we cannot say that the court clearly erred by viewing her work in Kentucky as a better opportunity.

Second, Williams challenges the court's finding that the move would allow access to "local medical attention for [the son's health] issues." The court added to this finding in its later discussion of the best interests factors, finding that "[t]here are hospitals in Kentucky which can provide ongoing care for [the child] without the need to fly to Seattle every few months."

Williams contends that the child's need for specialized medical treatment "was already behind him at trial," and all that remained "was a one-year check-up, a two-year check-up, and some elective genetic mapping." The record does not appear to contain specific evidentiary support for the court's findings about appropriate hospital care in Kentucky or a "need to fly to Seattle" more than yearly. But Williams has not disputed that whatever medical care *is* required can be provided in Kentucky. Although this factor does not add significantly to the court's finding that Daniel had legitimate reasons to move, it does not detract from it either.

Third, Williams argues that the court clearly erred by finding that Daniel would have better family support in Kentucky and could "keep[] both of her children together." He contends that she has friends and family members "throughout the State of Alaska" and that she does not have full custody of her older son — only "seven days of 'parenting time' per month" — so even after a move her sons could not live together.

But in Daniel's testimony she referred to Nashville as "home," explaining that her "entire family lives in that area." She testified that the support system she did have in Alaska — particularly "help with child care" and "babysitters" — had been "lost in this split" from Williams. It was up to the superior court whether to credit this

testimony.[20]  As for Daniel's older son, living in Nashville, she referred in her testimony to the "nightmare" that would result if she had to "continue having to fly back and forth to Tennessee every two weeks to work and exercise [her] parenting time with [her older son], which . . . is astronomically expensive."  But, she testified, "I can't leave one child for the sake of the other."  There was no testimony that the couple's infant son accompanied her on her trips to see her older son, so it is reasonable to conclude that the move would raise their chances of spending significant time together as they grow up.  And although Daniel did not have full custody of her older son, the court could also reasonably conclude that her limited time with him would be better spent and more consistent if they lived closer to each other.

All the court had to find in order to conclude that Daniel's planned move was legitimate was that it "was 'not primarily motivated by a desire to make visitation . . . more difficult.' "[21]  The court could reasonably find that the move was "primarily motivated" by some combination of a number of legitimate considerations. It was therefore not clear error to find, in the first step of its analysis, that Daniel's move was legitimate.

### 2. The factual findings supporting the best interests analysis were not clearly erroneous.

When considering a parent's planned move out of state, the superior court's second step in the *Moeller-Prokosch* framework "is to determine what is in the best interests of the child in light of all relevant statutory best interests factors and the

---

**20**    *See O'Brien v. Delaplain*, 556 P.3d 1170, 1180 (Alaska 2024) ("We afford particular deference to factual findings based primarily on oral testimony, because the trial court is better suited to judge the credibility of witnesses and weigh conflicting evidence." (alteration omitted) (quoting *Vang v. Xiong*, 531 P.3d 979, 983 (Alaska 2023))).

**21**    *Mengisteab*, 425 P.3d at 85 (quoting *Moeller I*, 27 P.3d at 316).

reasons for the relocation."[22]  Williams challenges a number of the court's factual findings relevant to the statutory best interests factors.  The first is that the parties' son "has physical problems which will require attention for the foreseeable future,"[23]  a finding Williams contends is contrary to the uncontradicted evidence that "no future medical intervention was necessary" and "[a]ll future medical appointments are the medical equivalent of status hearings."

The court described the child's condition as a fused skull that had to be surgically repaired "to allow for brain growth."  The surgery was performed in Seattle in November 2021 when the child was about seven months old; Williams described it as "a cranial vault ball remodeling."  Both parents testified that the surgery went very well.  But there was also uncontradicted evidence of the need for some follow-up care; both parties testified about a one-year post-surgical visit with the surgeons in Seattle, and Williams mentioned a two-year checkup as well and "extra stuff" that he said the doctor characterized as elective.  Williams consistently minimized the importance of this follow-up care, rejecting the suggestion that the child would require access to any specialized medical facilities.  But in his brief he relies only on Daniel's testimony that the child "healed beautifully" following his surgery, leaving out her qualifying language:  "[B]ut he is showing some speech delays and could benefit from some extra attention."  Williams does not persuade us that the superior court clearly erred by finding that the child had "physical problems since birth which will require attention for the foreseeable future."

Second, Williams challenges the court's finding that he "had a history of intentionally preventing [Daniel] from being involved in [the child's] medical

---

[22]     *Id.* at 85-86.

[23]     The court found this relevant to AS 25.24.150(c)(1), "the physical, emotional, mental, religious, and social needs of the child."

appointments."[24]  Williams contends that this finding is based on a single medical visit, when he took the child to Seattle for the one-year post-surgery evaluation and Daniel was not included in the meeting, for reasons Williams describes as "a missed or forgotten phone call."  As Daniel described it in her testimony, however, she "called and texted over and over to be included in the conversation with the doctors, and [Williams] did not answer, nor did [she] receive a phone call from the surgeons," despite a note in the son's medical chart that she "wanted to participate via Zoom or phone in the meeting."  She testified that Williams never explained why she was excluded from the Seattle meeting, nor did he "share any of the information from that appointment with [her]," and she "had to schedule a new appointment with the pediatrician to get the information that [she] needed in that appointment."

Whether this incident demonstrates "a history" of excluding Daniel from medical appointments may be debatable, but it was clearly a highly significant milestone in the child's recovery, and the court could credit Daniel's testimony that Williams ignored her attempts to be included and failed to share information with her afterwards.  Again, we see no clear error in the court's finding.

Third, Williams challenges the court's finding that the child's schedule would be unstable if Daniel moved away and the child stayed with him in Alaska.[25]  According to the court, under such circumstances it was "unclear who would take care of [the child] during Mr. Williams'[s] work weeks."  The court explained that Williams had "a sister who could help" but that he had also testified that the child "could stay with anyone 'in his tribe,' meaning [that the child] may not ever know where he is going

---

[24]  The court found this relevant to AS 25.24.150(c)(2), "the capability and desire of each parent to meet [the child's] needs."

[25]  The court found this relevant to AS 25.24.150(c)(5), "the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity."

to be when his father is away." Williams argues that he did, in fact, present "a concrete plan directly from those who would be responsible for coordinating the plan," particularly his sister.

But the court's finding has a solid basis in Williams's sister's testimony. She testified that while she and her husband "would be happy to keep" the child during Williams's work weeks, they "would like to break up the time among the cousins and the sisters so that [the child] can continue having a relationship with all of his same-aged cousins and all of [their] children that are around here."[26] She testified that "depending on what the schedule in the month looks like, [they] would break it up into days or weeks that . . . worked for [their] schedule." While we do not minimize the importance of this generous family support, the court's factual finding about an uncertain schedule was not clearly erroneous.[27]

Fourth, Williams contends that the court clearly erred by finding that Daniel "has a well-established history of allowing contact between [the child and Williams] during her custodial time," whereas Williams "has a very poor history of

---

[26] Williams's sister testified that he had "four sisters all within the state, all within 100 miles of him."

[27] Williams contrasts his network of family support with Daniel's "nebulous" plan for caring for the child if she remained in Alaska, arguing that the court's finding that the "child would suffer from instability in Alaska from [Williams], but not [Daniel], was clearly erroneous." But the court's task was to "assume that the move . . . will take or has taken place and 'make a determination as to whether it would be in the best interests of the parties' [child] to be in the physical custody of [one parent] or [the other]' in their respective locations." *Mengisteab v. Oates*, 425 P.3d 80, 86 (Alaska 2018) (alterations in original) (quoting *Moeller-Prokosch v. Prokosch*, 53 P.3d 152, 153 (Alaska 2002)). That is what the court did, contrasting the child's living situation with Williams in Alaska to what it would be with Daniel in Kentucky.

allowing contact between [the child] and Ms. Daniel during his custodial time."[28]  He quotes testimony from a scheduling conference about five months before trial began, when Daniel told the court, "[U]nless the court compels me to, I don't feel like I have to tell Mr. Williams exactly where my location is."  But the same discussion made clear that the parties *were* communicating about the child and that Daniel's reluctance to share her own whereabouts was due to a fear that Williams was stalking her, a fear she reiterated at trial.

Williams also cites his sister's testimony that he "once flew down to Denver to rescue the minor child from [Daniel] after [she] absconded from Alaska without permission with the minor child," testimony Williams claims was "not seriously disputed by any evidence presented at trial."  Williams is correct that the trial record contains little evidence of this incident.  Williams's own proposed findings of fact noted it, however, and explained that both parties filed petitions for protective orders, apparently as a result, and both petitions were denied for lack of evidence.  Given the sparse evidentiary record, we cannot say that the court should have given more attention to Williams's sister's second-hand description of the incident.[29]

As for what evidence *did* exist relevant to this finding, Daniel testified that when Williams had custody of their son, she "[o]ften" texted to inquire about him, and Williams responded by blocking her number.  She testified that he had an "extensive

---

[28]  The court found this relevant to AS 25.24.150(c)(6), "the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child."

[29]  Williams also cites testimony from Daniel's older son's aunt, who testified that there were "a lot of times" when Daniel would tell her that "she would comply with court orders to put [the older son] on a plane and let us spend Christmas [together], and then last minute she would change the plan."  The superior court could reasonably view this testimony as only marginally relevant, at best, to Daniel's relationship with Williams.

history" of doing this, "as recently as this week." She testified that she tried to make their "communications open and forthright" but failed because Williams would "[a]bsolutely not" communicate with her. She testified that although she was reluctant to inform Williams of her whereabouts, he was able to FaceTime with their son. She also testified, as described above, about her efforts to participate in the child's one-year checkup and Williams's failure to respond or to follow up with information about the appointment. The court was allowed to credit her testimony,[30] and, because of this evidentiary support for the court's finding, we see no clear error.

Fifth, Williams contends that the superior court clearly erred when it found that he had committed theft of her personal property.[31] We first observe that although the word "theft" appears in the relevant subheading of the court's findings — which were drafted by Daniel's counsel and then modified by the court — the court did not specifically find that Williams committed theft.[32] Besides relating Williams's denials, the court made only two factual findings: first, that the troopers executed a warrant to search his storage unit "and found numerous items that belonged to Ms. Daniel, to include numerous tools with her name on them," which Williams does not appear to dispute; and second, that Williams's actions "demonstrate his inability to maintain an amicable relationship with Ms. Daniel, or to communicate with her honestly," thus militating against an award of joint custody. Williams argues that "he

---

[30] *See O'Brien v. Delaplain*, 556 P.3d 1170, 1180 (Alaska 2024) (deferring to trial court's findings based on witness credibility).

[31] The court did not include this issue as relevant to one of the specifically listed custody factors but rather as another relevant consideration. *See* AS 25.24.150(c)(9) ("other factors that the court considers pertinent").

[32] The court crossed out several sentences in this paragraph of the proposed findings that used more charged language to describe Williams's actions.

never had the intent to steal anything, and that any taking of [Daniel's] property was accidental due to her property being com[m]ingled in with his own."

At trial Daniel testified that Williams stole her iPhone and failed to give it back despite the fact that she "asked many, many times." She testified that he took some of her tools to Montana and left them there. In answer to a question referring to "these tools that the troopers took" from the storage unit, Daniel denied that any of them belonged to Williams. She also testified that she reported a heater stolen after watching Williams drive away with it in the back of his sister's car; she testified that he called her "a liar for claiming that he had it." Williams, on the other hand, denied that he stole "anything." He testified that "[t]here was unintentional interface in the division of our assets," with the result that he may have accidentally ended up with something of Daniel's like "a screwdriver box or a bit index in tool bags." He also claimed that "a lot of [his] things" were among the items removed from the storage unit. He testified that he made "a good-faith attempt to return the heater" to Daniel but was "chased off the property, asked to leave."

In the face of this testimony, it was up to the superior court to assess the parties' credibility, resolve the conflicts, and draw what reasonable inferences it could.[33] We see no clear error. And regardless of how the court resolved the conflicts, it could reasonably conclude that the arguments over personal property meant that the parties

---

[33] *See Silvan v. Alcina*, 105 P.3d 117, 122 (Alaska 2005) ("When the superior court is faced with conflicting evidence, we do not re-weigh it."); *Hensel v. State*, 604 P.2d 222, 235 (Alaska 1979) ("The superior court, which sits as the trier of fact, has the opportunity to weigh the credibility of the evidence and witnesses before it, and it is entitled to resolve any conflicts and inconsistencies within the evidence.").

were unable to work together "in a joint legal custody relationship" and legal custody had to be awarded to one parent or the other.[34]

Sixth, Williams challenges the court's finding that his "actions . . . demonstrate his proclivity toward taking actions to harm Ms. Daniel even when the result impairs her ability to care for [their son]." He contends that there was no evidence "which might indicate a pattern of [him] taking repeated actions against [Daniel] for the sake of spite." He identified one incident to which the court could have been referring — when he put down a dog he claims was "old and living in chronic pain." But Daniel testified that Williams shot the dog when Daniel thought it should be rehomed, and the court could have credited her testimony over his.[35]

In any event, the dog incident was not the court's stated basis for its "proclivity" finding. Rather, the court described an incident involving a jointly owned BMW, which Daniel was using at the time the couple separated. The court explained that Daniel dropped the BMW off at a repair shop, and Williams "picked it up and traded it in" in violation of a preliminary order "barring the [sale] of jointly owned property" and without regard to the fact that "[h]is actions denied Ms. Daniel access to a running vehicle, and the ability to transport [the parties' child] or retrieve items necessary for [his] care." Williams does not dispute the court's description of this incident, which is

---

[34]     Williams makes a separate argument that the court, in rejecting joint legal custody as an option, gave too much weight to the parties' disputes over their personal property and too little to the "multiple occasions" on which the parties "communicated effectively." We have repeatedly stated that "joint legal custody is only appropriate when the parents can cooperate and communicate in the child's best interest." *Farrell v. Farrell*, 819 P.2d 896, 899 (Alaska 1991). The record is replete with evidence of the parties' inability to effectively communicate with each other; Williams himself observed, in his motion for reconsideration, that "[t]he parties have had an extremely volatile and contentious relationship." We see no abuse of discretion in the court's legal custody award.

[35]     *See O'Brien*, 556 P.3d at 1180.

supported by his own testimony.[36]  Again, we see no clear error in the court's "proclivity" finding.

In sum, we are not persuaded that the court clearly erred in any of the factual findings relevant to its best interests analysis.

### 3. The superior court did not abuse its discretion in weighing the statutory best interests factors.

When analyzing the statutory best interests factors, the superior court has considerable discretion in determining how much weight to assign to each of them.[37] Williams challenges the court's decision on several of the factors, arguing that it assigned too much weight to some considerations and too little to others.

First, with regard to the child's medical needs and each parent's capability and desire to meet them,[38] Williams argues that the court "assigned too much weight to the . . . child's already-resolved skull issues."  But as already discussed above, the evidence supported the court's finding that the child's physical condition would "require attention for the foreseeable future," and Williams does not challenge the court's related finding that Daniel was historically the parent more involved in the child's medical care.

---

[36]    Williams testified that Daniel's "name was on the [BMW's] title but not on the loan" and that he had "paid all maintenance and payments on the vehicle."  He testified that he sold the vehicle at a loss when he learned that Daniel refused "to settle [the parties' dissolution action] outside of court."

[37]    *Judd v. Burns*, 397 P.3d 331, 339-40 (Alaska 2017) ("While the 'court cannot assign disproportionate weight to particular factors while ignoring others, it has considerable discretion in determining the importance of each statutory factor in the context of a specific case and is not required to weigh the factors equally.' " (quoting *Andrea C. v. Marcus K.*, 355 P.3d 521, 528 (Alaska 2015))).  Williams characterizes the court's alleged weighting errors as errors of law, but our case law plainly requires that we apply an abuse of discretion standard of review.

[38]    AS 25.24.150(c)(1), (2).

Second, Williams contends that the court gave too much weight to testimony that the child "would come home sick from [Williams's] care frequently, had COVID-19 twice, and on one occasion [returned home] underweight." He concedes that "[t]hese facts were not contested at trial, and the [c]ourt was right to weigh them," but he contends that if the court considered them to be parenting failures on his part, it should have balanced them against Daniel's "undisputed failures in caring for her older son," who had serious mental health issues, needed dental work, and was once sexually abused during after-school care. But while Daniel's care for her older child was relevant to her parenting abilities generally, the specific issue before the court was the parents' respective ability to care for their infant son; we cannot say that the court abused its discretion when it focused on the parties' demonstrated willingness and ability to care for the child whose custody was in dispute.

Williams next contends that in considering the child's need for stability and continuity,[39] the court overvalued the child's relationship with his older half-brother in Kentucky while giving too little weight to the child's "four aunts and his large Alaska family connections through [Williams] and the paternal side of the family," including "numerous 'same-aged cousins.'" But although the court cited the sibling relationship when discussing the justifications for Daniel's proposed move, the court did not mention it again in the context of the best interests factors or assign it any particular weight. And the court acknowledged Williams's large and potentially supportive Alaska family but, as discussed above, concluded that Daniel would be able to give the child a more predictable schedule in Kentucky, tilting the factor in her favor.

Williams also argues that the court assigned too much weight to his two-weeks-on/two-weeks-off work schedule and ignored the evidence of his "cohesive, massive family unit ready and able to care for [the child]." But again, the court did not

_____

[39] _See_ AS 25.24.150(c)(5).

overlook this evidence; it just found it outweighed by the stability in work and homelife that Daniel was likely to achieve once she relocated. We see no abuse of discretion in the court's weighing of the stability factor.

Finally, Williams contends that the court erred when it found that his "lack of a driver's license weighed against him under AS 25.24.150(c)(8)."[40] The court found that Williams' license revocation — following three convictions for driving under the influence, "the last being a felony DUI" — "could impact [his] ability . . . to provide for the daily needs of [the child], especially in emergency situations." Williams counters that "[n]o evidence was presented at trial that [he] struggled in any manner to provide for" the child, or that he was "unequipped to handle emergency situations." He contends that in case of a real emergency he could drive regardless of his lack of a license and would be protected from prosecution by the necessity defense.[41]

But the court could reasonably conclude that a parent who has lost his driver's license is, at least to some degree, less able to accomplish the normal day-to-day activities of childcare. And a parent who must risk arrest in order to respond to emergencies is plainly disadvantaged when it comes to caring for the child's well-being.[42]

---

[40] The statute requires the court to consider "evidence that substance abuse by either parent . . . directly affects the emotional or physical well-being of the child."

[41] The necessity defense to a criminal charge depends on evidence "(1) that the defendant committed the charged offense to prevent a significant evil"; (2) that the defendant reasonably perceived there to be "no reasonable alternative" to breaking the law; and (3) "that the harm threatened or caused by the defendant's crime was not disproportionate to the harm that the defendant sought to avoid by breaking the law." *Scharen v. State*, 249 P.3d 331, 333 (Alaska App. 2011) (citing *State v. Garrison*, 171 P.3d 91, 94 (Alaska 2007)).

[42] In support of a motion for reconsideration of the court's written findings of fact and conclusions of law, Williams submitted evidence showing that effective

We see no abuse of discretion in the superior court's weighing of any of the statutory best interests factors.

**B.**     **The Superior Court Did Not Clearly Err In Finding That Neither Party Had A Divisible Interest In The Palmer Property.**

Williams argues that the court "erred as a matter of law in its finding that 'neither party has an ownership interest in the [Palmer property].' " We do not see an error.

There is no dispute that Williams and Daniel were in a domestic partnership and that they intended to share at least some of its responsibilities and rewards. "Property acquired by domestic partners during a domestic partnership should be distributed according to the partners' intent."[43] But distribution is the last step in a four-step process:

> The first step . . . is to assess when the partnership began and ended. . . . The second step is to classify each item of property held by the parties as partnership property or separate property based on applicable law. . . . The third step is to value the property. . . . [And t]he final step is to distribute the property. [44]

The Palmer property was excluded from distribution because of the second step: the superior court found that it was not "property held by the parties."

Specifically, the court found that the property had been owned by Daniel's father; that Daniel wanted to buy it "and renovate it as an income property"; that toward that end Daniel and Williams "entered into a short[-]term mortgage" with Daniel's

---

November 2022 he had been issued a limited license (limited to vehicles equipped with an ignition interlock device). This evidence was not brought out at trial, even though the reinstatement is dated months before the final trial day in March 2023; the court did not address the issue in its order on reconsideration; and Williams does not mention it on appeal.

[43]     *Tomal v. Anderson*, 426 P.3d 915, 922 (Alaska 2018).

[44]     *Id.* at 922-24.

father; and that Daniel then "spent a large amount of her personal funds on renovating the property so that it would qualify for a traditional loan." However, "[w]hen the term of [Daniel's father's] loan ended[,] a large balloon payment was due[,] and neither [Williams nor Daniel] could pay the debt." The court found that "Williams would not sign the loan documents required for Ms. Daniel to refinance the property via traditional financing[,] so [Daniel's father] foreclosed on the property and purchased it at auction." The court further observed that neither Williams nor Daniel contested the foreclosure or the auction. Williams does not appear to challenge any of these factual findings.

What Williams does challenge is the court's legal conclusion based on these facts: that the parties no longer had any "ownership interest in the property . . . that [was] available for assignment by the [c]ourt." Williams argues that the evidence "clearly demonstrate[d] that [he and Daniel] intended to share joint ownership" of the Palmer property; that he made "substantial contributions in terms of time, energy, labor, and money towards the development of the Palmer property as a bed and breakfast"; and that as a result he and Daniel had an implied contract, a partnership, or some other equitable relationship that should take precedence over her father's legal title, "especially considering [Daniel's] continued involvement in the property post-foreclosure," when, under her father's ownership, she "continued to Airbnb host out of the Palmer property."

But regardless of the nature of Daniel and Williams' relationship — and regardless of their intentions for the property — Williams provides no support for an argument that the court could allocate interests in a third party's property as if it belonged to the domestic partnership.[45] He does recite the elements of marital waste,

---

[45]   *Cf., e.g.*, *In re Muller*, 62 A.3d 770, 776 (N.H. 2013) (holding that court dividing marital property "does not have the jurisdiction to disregard or invalidate a third party's claim of interest in marital property"); *Vanderlugt v. Vanderlugt*, 429 P.3d

which if found could justify an adjustment of the property allocation in favor of the non-wasting party.[46] But he does not make an argument based on the elements of waste, nor does he appear to have raised the issue in the superior court.[47] And even a finding that Daniel had wasted the Palmer property by allowing it to go into foreclosure would not mean that the domestic partnership could recapture it from its current owner; "the proper remedy [for unreasonable depletion of marital resources] is to recapture the lost asset *by valuing it at separation and crediting that value to the responsible party*."[48]

---

1269, 1273 (N.M. App. 2018) ("Generally, . . . if property does not belong to either spouse, then it is not subject to division in a divorce case."); *Graves v. Graves*, 51 A.3d 521, 524 (D.C. App. 2012) (holding that superior court's "broad authority to distribute marital property in the course of dissolving a marriage" "does not extend to property that third parties own (in whole or in part), when those parties are not before the court").

[46] "The elements of unreasonable depletion [i.e., marital waste] are (1) use of [marital] property for the spouse's own benefit, (2) at a time when the marriage is breaking down . . . , [and] (3) with an intent to deprive the other spouse of the other's share of the marital property." *Jordan v. Jordan*, 480 P.3d 626, 631 (Alaska 2021) (alteration in original) (quoting *Elliott v. James*, 977 P.2d 727, 733 (Alaska 1999)).

[47] *Adamson v. Univ. of Alaska*, 819 P.2d 886, 889 n.3 (Alaska 1991) ("[W]here a point is given only a cursory statement in the argument portion of a brief, the point will not be considered on appeal."); *Alex H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 389 P.3d 35, 46-47 (Alaska 2017) ("Where a party has failed to sufficiently raise an issue [in the superior court] we generally consider that argument waived.").

[48] *Rohde v. Rohde*, 507 P.3d 986, 993 (Alaska 2022) (emphasis added). Some courts allow determination of third-party rights in a divorce action "when it is claimed that a third party has conspired with one spouse to deprive the other spouse of an interest in the marital estate." *Thames v. Thames*, 477 N.W.2d 496, 499 (Mich. App. 1991). Williams does not explicitly make such an argument here. Nor did he attempt to join Daniel's father as a necessary party to the dissolution action. *See Glade v. Glade*, 45 Cal. Rptr. 2d 695, 701 (Cal. App. 1995) ("[E]ither spouse in a marital dissolution action may join third parties claiming an interest in alleged community property."); *In re Bell*, 481 S.W.3d 855, 865 (Mo. App. 2016) ("When the ownership of putative marital property involves the interest of a third party, joinder of that party is necessary

Williams insists on an ownership interest in the lost property, which was not within the court's power to give.

We conclude that the superior court did not err by concluding that the parties lacked any interest in the Palmer property that was subject to allocation in their dissolution.

## V.    CONCLUSION

We AFFIRM the superior court's order deciding child custody and the distribution of domestic partnership property.

---

to alleviate due process concerns and permit the court to carry out its statutory duty of dividing the marital property between the spouses."); *Upchurch v. Upchurch*, 468 S.E.2d 61, 63-64 (N.C. App. 1996) ("[W]hen a third party holds legal title to property which is claimed to be marital property, that third party is a necessary party to the equitable distribution proceeding, with their participation limited to the issue of the ownership of that property."); *Appeal of Sexton*, 380 S.E.2d 832, 834 (S.C. 1989) ("[W]hen property is alleged to be marital property, but it is owned by a third party, the Family Court has the subject matter jurisdiction to join all persons with a possible interest in the property as parties to the action and to determine if the property constitutes marital property . . . .").